140 F.3d 335
 76 Fair Empl.Prac.Cas. (BNA) 1340,
73 Empl. Prac. Dec. P 45,294,
73 Empl. Prac. Dec. P 45,383,
49 Fed. R. Evid. Serv. 203
John M. KELLEY, Plaintiff, Appellee,
v.
AIRBORNE FREIGHT CORPORATION d/b/a Airborne Express,
Defendant, Appellant.
 No. 96-2057.
 United States Court of Appeals,
First Circuit.
 Heard April 7, 1997.
Decided April 7, 1998.
 
 James W. Nagle, with whom Wilfred J. Benoit, Jr., Anthony M. Feeherry and Goodwin, Procter & Hoar LLP were on brief for appellant.
 Stephen S. Ostrach and Cynthia L. Amara, New England Legal Foundation, on brief for Associated Industries of Massachusetts, amicus curiae.
 David G. Hanrahan, with whom Ross D. Ginsberg and Gilman, McLaughlin & Hanrahan, LLP were on brief for appellee.
 Before TORRUELLA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.
 STAHL, Circuit Judge.
 
 
 1
 Defendant/appellant Airborne Freight Corporation ("Airborne") appeals from a jury verdict in favor of plaintiff/appellee John Michael Kelley ("Kelley"). After a ten-day trial, a jury found that Airborne had wilfully discriminated against Kelley on the basis of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. ("ADEA") and knowingly violated its state law counterpart, Mass. Gen. Laws ch. 151B ("ch.151B"). The district court accordingly entered judgment for Kelley in the amount of $1,244,152.24 on the ADEA claim, $3,136,858.29 on the ch. 151B claim and awarded attorney fees of $190,000. Airborne seeks a new trial, contending that (1) various evidentiary rulings affected the verdict and (2) the jury instructions were incomplete and misleading. In addition, Airborne claims that the district court improperly calculated the damages. We disagree and affirm.I.
 
 Background
 
 2
 On appeal we examine the facts, consistent with record support, in the light most favorable to the verdict-winner. See Cumpiano v. Banco Santander P.R., 902 F.2d 148, 151 (1st Cir.1990).
 
 
 3
 Airborne delivers time-sensitive packages. In 1974, at age twenty-eight, Kelley quit college to join Airborne as a District Manager in Tucson, Arizona. Kelley rose through the ranks, progressing through a series of jobs with increasing responsibility. During the mid-1980s, the Northeast Region, which consists of the New England states and most of New York, was beset by operational problems that were undermining sales in the Boston area. Airborne asked Kelley to transfer from Miami to Boston to improve the company's operations in the region. In July 1987, at age forty-one, Kelley was promoted to Regional Field Services Manager ("RFSM") for the Northeast Region.
 
 
 4
 Airborne is divided into two divisions: sales and field services. The sales division sells Airborne's services and maintains active client accounts. The field services division, also referred to as "operations," is responsible for ensuring the timely delivery of parcels. As RFSM, Kelley was in charge of the operations side of the business for the entire Northeast Region.
 
 
 5
 President and Chief Operating Officer Robert Brazier was in charge of both divisions nationally. Executive Vice President Raymond T. Van Bruwaene, who reported to Brazier, managed three Area Vice Presidents, including Kelley's supervisor, William Simpson. Kelley was one of five RFSMs working under Simpson. Regional Sales Manager James Guiod, was in charge of the sales division in the Northeast Region. Guiod and Kelley were at the same managerial level and essentially ran the region together with divided responsibility. Richard Goodwin directed Airborne's human resources division.
 
 
 6
 Airborne performs annual reviews of its managers and collects various data to assess their performance. During Kelley's initial tenure from mid-1987 to mid-1990, the reviews he received from Simpson were mixed. Although the quality of Airborne's service in the region improved, the region demonstrated some continuing problems in meeting profit goals.
 
 
 7
 In a review conducted in June 1990, Simpson was critical of Kelley's management skills. Betsy Tate, a lower-level manager in Rochester, New York, had complained to Simpson that Kelley was sexually harassing her. Simpson confronted Kelley concerning Tate's complaints and issued him a verbal reprimand. In a written review, Simpson noted that the region had failed certain "quality-of-service" audits, that Kelley at times displayed a sexist attitude, and that he failed to follow company policy on sexual harassment. Simpson placed Kelley on probation and informed him that, if improvements were not made, he would be discharged at the end of the year, but if improvements were made, Simpson would try to have the incident removed from Kelley's record.
 
 
 8
 Despite these management problems, Kelley's region enjoyed some notable successes. In January 1988, Brazier instituted an incentive program called the "Top Gun" Contest, which awarded $10,000 to the pair of Sales Managers and RFSMs who had the greatest volume increase in domestic and international outbound express shipments and revenue each quarter. Between 1988 and 1991, Guiod and Kelley won the Top Gun award four times, more than the managers in any other region, prompting Brazier to commend them in December of 1991 for "being better at selling and servicing than any of [their] peers." Each letter spoke of Kelley and Guiod in glowing terms.
 
 
 9
 Following the June 1990 review, Kelley apparently made the improvements Simpson requested. In his evaluation covering the period from October 1990 to October 1991, Simpson rated Kelley as "Superior to Outstanding" in each performance category: service, productivity, cost control, net profit, progress toward improvement, problem solving, leadership/management skills, knowledge and technical competence, and communication skills.
 
 
 10
 In late September 1992, Simpson received several complaints about local service failures within Boston. For reasons that remain less than precisely clear, Airborne had developed a practice of sending all packages originating in Boston--including those destined for Boston-area delivery--on airplanes to Ohio, where the packages destined for local delivery were sorted and then routed back to Boston. Despite this circuitous delivery route, local packages were still delivered on-time the next day unless the airplane suffered a mechanical failure or there was a weather-induced delay which made the packages late on arrival. These mechanical failures occurred on a number of occasions, which understandably prompted complaints from three Boston customers (Thomas Cook, Bank of Boston, and Teradyne) because they saw no need to send local packages to Ohio for sorting. Simpson verbally directed Kelley to set up a local "sort" process to obviate the need to send local packages on this seemingly unnecessary round-trip. Although service failures were a consistent occurrence in the delivery business, mistakes like the sort problem caused Airborne to lose customers, straining the relationship between Kelley and Guiod.
 
 
 11
 During this time, Simpson complained about the inept performance of a manager under Kelley's supervision, Bob Cox, who was also Kelley's brother-in-law. Cox managed the region's North Shore Station, a station beset with operational problems. The most notorious gaffe involved an incident in which a driver from Cox's station failed to deliver over one hundred parcels for Miles Agfa, a new multi-million dollar national account, leaving the parcels on a truck parked on Airborne's lot for an entire weekend. Company policy required supervisors to accompany drivers when first servicing large new accounts, but Cox failed to do so. As required by the company's progressive discipline policy, Kelley gave Cox time to improve his performance but eventually fired him in February 1993.
 
 
 12
 In the summer of 1992, shortly after having suffered a minor stroke, Kelley attended a meeting with Simpson, Goodwin, Van Bruwaene, and other RFSMs from Simpson's area regarding a planned reduction in force ("RIF"). Goodwin, who managed the Human Resources Division, informed those present that age was one of the relevant characteristics in deciding whom to fire. Simpson said, in substance, that the RIF would "be an excellent opportunity to get rid of some of the older mediocre managers" in Area 1.
 
 
 13
 That summer, Airborne terminated thirty-four employees as part of the RIF, including the oldest manager in Kelley's region, who was in his mid- to late forties.
 
 
 14
 In 1992, a price war broke out between Airborne and Federal Express, placing considerable pressure on managers to meet customer expectations. During this time, the company regularly performed quality-of-service audits to measure the efficiency of the operations within a region. In July 1992, Kelley's region, which Airborne admitted was one of the more difficult regions in the country to manage, was the only region under Simpson's control that met Airborne's goal of delivering ninety-five percent of the packages before noon. In August 1992, Simpson informed the RFSMs that Kelley's region had passed all quality-of-service audits and congratulated him for this accomplishment. In October 1992, Simpson sent an E-mail message to his subordinates recognizing Kelley's Northeast Region for having the best average score of any region in the company on quality of service audits conducted during the year. In November 1992, Simpson again congratulated Kelley for "tearing them up" because the region continued to perform well on the quality of service audits. As a result, Simpson informed Van Bruwaene that Kelley was performing quite well. Van Bruwaene was "elated" with Kelley's performance, agreeing that Kelley's region was performing well as measured by the audits.
 
 
 15
 On December 5, 1992, three and one-half months prior to his termination, Kelley received his annual performance review from Simpson. Airborne used the appraisals to "determine how various people of various management levels are doing in comparison to others of the same job." Kelley received a nine--the highest score possible--in the "progress toward improvement" category and a "superior rating overall." When providing Kelley recommendations for further improvement, Simpson wrote:
 
 
 16
 You have made significant improve [sic] in 1992. Service is at an all time high in region. Quality of service audits have been excellent in past few months. Driver/Owner costs need constant attention.
 
 
 17
 The performance review did not mention any specific service complaints from Boston-area companies, any problems regarding sexual harassment, the Boston "sort" problem, Kelley's management of the Cox situation, or any other management problems. In early March, Kelley believed that he was performing so well that he asked Simpson for a promotion to vice-president.
 
 
 18
 On March 10, 1993, the Board of Directors voted to give Kelley stock options. The letter from the Chairman of the Company, Robert S. Cline, stated:
 
 
 19
 The Directors make these awards to key employees who continue to grow with the company and who they believe are capable of assuming greater responsibility in the years ahead.
 
 
 20
 On March 12, 1993, Robert Brazier, the President of Airborne, received a letter from the Bose Corporation, a Boston-based company, complaining that Airborne had failed to make a number of deliveries. The letter recounted that, when Bose complained to Airborne following the incident, an Airborne employee offered the excuse that the driver had been out sick. Brazier assumed that the problem had occurred in Boston and blamed Kelley for this unnamed employee's incompetence. Without having investigated the circumstances surrounding the complaint, Brazier sent a vitriolic E-mail message to Van Bruwaene stating in part:
 
 
 21
 This kind of stuff goes on every day when the regional and district management are not smart enough to sense it and fix it for good! I know you and I don't differ on Kelley, and I know Simpson doesn't agree with either of us. I am at the point where I don't give a damn what Simpson thinks or for that matter anyone else who chooses to ignore stupidity, mediocre performance, poor service, or the host of ways that we become aware of weak management. The more we tolerate this the longer we condemn this company to be mediocre or worse ... and I have had enough of it.
 
 
 22
 The service failure that prompted the Bose complaint and Brazier's response had occurred in Milwaukee, not Boston, and was neither Kelley's fault nor in Kelley's region.
 
 
 23
 On March 15, 1993, Van Bruwaene responded to Brazier, his supervisor, agreeing with Brazier's assessment of Kelley. He defended his own handling of the situation, saying that he and Simpson had been discussing Kelley for some time. He protested:
 
 
 24
 I don't want you to believe that Bill [Simpson] or I for that matter, protect people who are not capable of doing the job.
 
 
 25
 At the same time, Van Bruwaene sent a copy of the Brazier E-mail to Simpson, scribbling on the bottom: "[Kelley] isn't worth putting our jobs on the line. Both of us should have known it earlier."
 
 
 26
 Van Bruwaene informed Brazier, after a "follow-up" conversation with Simpson, that they had decided to terminate Kelley within the following two weeks. Van Bruwaene also forwarded Brazier's message to Goodwin stating:
 
 
 27
 Attached for your information. Bill Simpson will be calling you for your help on this one. Hopefully we have enough data to avoid a wrongful termination.
 
 
 28
 On March 15, 1993, Simpson, although supposedly the decisionmaker, worked with Goodwin to orchestrate the mechanics of Kelley's dismissal. Goodwin drafted the termination letter, while Simpson provided the information justifying the decision in a telephone conversation and an E-mail message. At about the same time, Goodwin admitted that he had to be careful in drafting the termination letter because Kelley "was over forty years old." Goodwin created a written list of possible reasons, purportedly obtained from Simpson by phone, which included, inter alia, (1) "turnover of national accounts," (2) "not good with customers--no empathy," (3) the problems with Bob Cox, (4) sexual harassment of Betsy Tate, and (5) the intra-Boston sort problem. The list acknowledged that Kelley's "numbers"--referring to the statistical measures used to gauge a manager's performance--were "OK." In an E-mail message to Goodwin dated the same day, Simpson listed the Cox problem, the sort problem, complaints from major Boston customers, and that Kelley went golfing too much with his managers. Simpson ended the E-mail by saying "that is all I can think of right now." Three minutes later, though Kelley would be fired in eight days, Simpson sent an E-mail to Kelley castigating him for certain "reweigh reports" and demanding that he fix the situation. The next morning, Simpson forwarded Kelley's response and the reweigh report to Goodwin, who was in the process of formulating Kelley's termination letter, as additional evidence to justify the coming termination. In a March 19, 1993 E-mail, Van Bruwaene wrote a memo to Goodwin and Simpson in which he stated that "this is going to be a messy termination."
 
 
 29
 On March 24, 1993, Simpson delivered to Kelley the termination letter, which contained five numbered paragraphs explaining the reasons for the termination. Notably, the letter did not mention the Bose complaint and Brazier's response. In fact, Brazier eventually learned that Kelley had not been responsible and testified that the incident was not the catalyst for Kelley's termination. Instead, the letter cited the following: (1) "a clear pattern of complaints about [Kelley] and [his] management style ...."; (2) procrastination and delays in following directions; (3) poor judgment and management behavior; (4) his "bullish" management style; and (5) Simpson's inability obtain information from Kelley's region and his inability to build a team relationship with Kelley's managers. After nineteen years of service, Kelley was informed that March 24, 1993, would be his last day at Airborne. Kelley, then forty-six years old, was replaced with a thirty-seven year old manager.
 
 
 30
 The ten-day trial was primarily devoted to whether the reasons Airborne gave in the March 24, 1993, termination letter were the real reasons why Airborne fired Kelley. Kelley introduced evidence that his performance was superior, that the reasons given in the letter were not true, but rather were carefully selected to be unchallengeable in court, and that Airborne was biased against older workers. Airborne contended that the reasons given in the letter were the real reasons for Kelley's dismissal.
 
 
 31
 The termination letter had claimed that Kelley's performance prompted customer complaints that required Brazier, Van Bruwaene, and another upper manager, Kent Freudenberger, to intercede. At trial, Brazier could not provide details of any specific instances in which he had to intercede because of Kelley, and admitted that, when he did have to deal with customer complaints emanating from Boston service failures, the incidents occurred mostly before 1991. In addition, he described his responses to customer complaints as routine sales calls and was unable to tie any of these complaints specifically to Kelley. Van Bruwaene could not identify specific instances when he had to intercede because of complaints concerning Kelley. Interestingly, Airborne chose not to call Freudenberger to testify. Although the termination letter claimed that Simpson "had to spend more time" dealing with customer relations and service problems in the Northeast than other regions, Airborne's data that measured the quality of service demonstrated the Kelley's region was performing as well, or better, than other regions.
 
 
 32
 The termination letter also claimed that "[p]rocrastination and delays in following directions and policy [was] another serious flaw in [Kelley's] performance as a senior operating manager." Cited as examples were complaints from Boston customers regarding the lack of a local sort process; Kelley's violation of company policy in hiring Cox, his brother-in-law, to report directly to him; and his fostering an environment which condoned sexual harassment. At trial, however, Airborne openly denied that Kelley was fired for the sexual harassment of Betsy Tate. Airborne's attorney said in his opening that "We're not going to stand here and tell you that in 1993, after several years, we're going to take it out on Mr. Kelley concerning sex harassment ... in the late 80s." In addition, at the time of the dismissal decision, Simpson was not aware of any other sexual harassment claims against Kelley. While Airborne accused Kelley of nepotism in allowing Cox to report to him, Van Bruwaene admitted that his son worked for Airborne. Further, Kelley had already fired Bob Cox on February 12, 1993, after having given him sixty days to improve his performance as the company's progressive discipline policy required. Although Simpson had mentioned the Boston sort problem verbally to Kelley in September 1992, there was no mention of the problem in his December 1992 evaluation, which rated Kelley "superior" in completing projects in a prompt manner.
 
 
 33
 In its termination letter, Airborne additionally claimed that it was firing Kelley for making poor management decisions, citing "[s]everal ... employees [who] felt so strongly about the unfairness of management behavior that a letter was written to the President...." The letter in question turned out to be from an anonymous employee complaining about thefts and lack of management at Cox's station and managers playing golf during the day. A former FBI agent whom Airborne had hired to investigate these allegations found the charges groundless and absolved Kelley of all fault in regard to this incident prior to his termination.
 
 
 34
 Further, Airborne's letter cited Kelley's "bullish" management style. This purported aspect of Kelley's management style was never discussed as a problem in his evaluations, and Simpson testified that he saw Kelly "bully" someone on only one occasion. At trial, Airborne claimed that Simpson made up his mind to terminate Kelley in early March after meeting individually with two sales employees, Bob Jackson and Chris Beach, who worked for Guiod. In their meetings with Simpson, Jackson and Beach blamed service problems and loss of revenue on Kelley. Kelley was not informed of these meetings, nor was he given an opportunity to respond. Simpson claimed that, as a result of these meetings, he concluded that the relationship between sales and operations divisions in Boston was "unbearable, and ... that there was no way Mr. Kelley could ever turn it around." Thus, after the meetings, he decided to terminate Kelley. The termination letter, however, described poor relationships between sale and operations as "not uncommon," and did not mention the complaints from Jackson and Beach. In short, Airborne's witnesses proffered a version of events that often seemed in conflict with other evidence adduced at trial, and they contradicted each other in attempting to explain Kelley's dismissal.[1]
 
 
 35
 In its closing, Airborne argued that Kelley had been terminated because he was an incompetent manager and a liar, not because of his age. Counsel stated: "You may decide, if it had been me, I may have not done all of those things. That is not the issue. The issue is not whether your business judgment is the same as Mr. Simpson's business judgment. The issue is, what does this have to do with age? That's all there is. What does it have to do with age?"
 
 
 36
 Plaintiff argued that the reasons Airborne gave for firing Kelley were pretextual and that Airborne was biased against older workers. Counsel reviewed the reasons Airborne gave in its letter and argued that the testimony at trial showed that these reasons were not true, but were fabricated to justify firing Kelley. He argued that the reasons recited in the letter were carefully chosen from a list of potential reasons discussed by Goodwin and Simpson on March 15, 1993, and that those chosen were deliberately subjective factors not capable of being easily challenged in court. He also pointed out that there were no employees in Kelley's region who were over the age of forty-nine.
 
 
 37
 In charging the jury, the district court described, at length, the controlling law under the ADEA and ch. 151B. The jury was then provided a verdict form with Fed.R.Civ.P. 49(b) interrogatories. Question 2 asked whether the "plaintiff proved that his age had a determinative influence on defendant's decision to discharge him." If the jury answered Question 2 affirmatively, this finding was sufficient to enter judgment on both the state and federal claims. If the jury answered Question 2 negatively, they were to answer Question 3, which asked whether "the plaintiff has proved that the reasons stated for discharge stated in the March 24, 1993, discharge letter were pretextual--i.e., that they were intended to mask some other, unstated reason for the discharge." Question 4(a) asked whether "defendant knew the discharge was in violation of federal law prohibiting age discrimination or acted with reckless disregard of that law." Question 4(b) asked whether "defendant knew or had reason to know that the discharge was in violation of state law." The jury responded affirmatively to all the interrogatories except Question 3, to which it appropriately did not respond.
 
 
 38
 The jury awarded Kelley $253,442.08 in back pay damages, an amount to which the parties stipulated prior to trial. The jury also awarded $250,000 in emotional distress damages and $1,000,000 in front pay under ch. 151B, § 9. After the verdict, Airborne asked the district court to exercise its equitable power to order that Kelley be reinstated as an "at-large RFSM," a position Airborne said it had created for him. After a two-day hearing, on June 11, 1996, the trial court found reinstatement impracticable and approved attorney's fees of $190,000. Airborne filed three additional post-trial motions: a motion for judgment as a matter of law, a motion for a new trial, and a motion for remittitur. The trial court denied the first two motions, but granted the motion for remittitur in part, reducing the emotional distress damages to $150,000. Applying ch. 151B, § 9, the district court endorsed the jury's finding of willfulness and imposed a multiplier of 2.25 to the back pay, the front pay, and the reduced emotional distress damages. The district court explained its reasons for applying the multiplier:
 
 
 39
 [E]vent after event led me to believe that the testimony being offered by this parade of Airborne Express witnesses was not credible and that charges were being made against Mr. Kelley that were fanciful.
 
 
 40
 ...
 
 
 41
 [I]t was clear to me that the discharge of Mr. Kelley was orchestrated deliberately and without restraint.
 
 
 42
 ...
 
 
 43
 Mr. Simpson and Mr. Goodwin [tried] to portray to the jury a scenario simply contrary to fact.
 
 
 44
 The district court accordingly entered judgment against Airborne in the amount of $3,136,858 on the state claim.
 
 II.
 Discussion
 
 45
 Airborne contends that various erroneous evidentiary rulings, incorrect or inaccurate jury instructions, and questions asked by the district court were so prejudicial to Airborne that a new trial should be required. In addition, Airborne challenges the award of damages under ch. 151B, § 9. We consider each of these claimed errors in turn.
 
 A. Evidentiary Rulings
 
 46
 Appellant presents myriad evidentiary claims. We review evidence questions for abuse of discretion. See Cohen v. Brown Univ., 101 F.3d 155, 168 (1st Cir.1996).
 
 
 47
 Airborne first contends that the trial court erred in excluding as hearsay the particular details of customer complaints made about Kelley to Brazier, Simpson and Guiod, which Airborne claimed formed part of the nondiscriminatory basis for Kelley's dismissal. Airborne argues on appeal that it offered the complaints to show that Simpson was aware of their existence, not "for the truth of the matter asserted," and therefore the complaints did not constitute hearsay. See Fed.R.Evid. 801(c); United States v. McKeeve, 131 F.3d 1 (1st Cir.1997). We agree that a customer complaint offered to show, for example, that a decisionmaker had notice of the complaint, rather than to prove the specific misconduct alleged in the complaint, is not barred by the hearsay rule. See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 575 (1st Cir.1989); see also F.T.C. v. Amy Travel Serv., Inc., 875 F.2d 564, 576 n. 11 (7th Cir.1989). We need not, however, analyze the admissibility of Airborne's excluded complaint evidence in detail because any error in excluding that evidence was harmless. See Fed.R.Civ.P. 61 (requiring the reviewing court to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"). Assuming, for the sake of argument, that Airborne did offer some of the excluded evidence for a nonhearsay purpose, Airborne successfully introduced a copious amount of testimony and documentary evidence regarding customer complaints of which Simpson was aware when he discharged Kelley. Airborne thus had ample opportunity to present to the jury its theory that customer complaints led to Kelley's demise. The additional testimony at issue was, at best, cumulative.
 
 
 48
 Airborne next challenges the district court's application of Rule 403 in a number of instances. "[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. "Only rarely--and in extraordinarily compelling circumstances--will [this court] from the vista of a cold appellate record, reverse a district court's on the spot judgment concerning the relative weighing of probative value and prejudicial effect." Freeman v. Package Machinery Co., 865 F.2d 1331, 1340 (1st Cir.1988).
 
 
 49
 First, Airborne contends that the court wrongfully excluded, via Rule 403, certain "Leading Edge" E-mail reports that Guiod sent to Simpson describing service failures in the Boston area from November 1992 to March 1993 that Guiod believed could cause revenue losses. The district court excluded the reports, in part, because they were cumulative of other evidence concerning customer complaints in Boston. For the same reasons stated supra, the court was well within its discretion in making this determination.
 
 
 50
 Second, Airborne challenges the district court's decision to admit Airborne's Employee Relations Guidelines for Disciplinary Action ("Guidelines") over Airborne's timely Rule 403 objection. The Guidelines contained specific progressive discipline procedures managers were supposed to follow when faced with poorly performing employees. Kelley introduced the Guidelines to demonstrate that Airborne had failed to follow its own disciplinary procedures in summarily dismissing him after nineteen years of service. To the extent Airborne claimed to have terminated Kelley because of incompetence, Simpson's failure to follow a written company policy that required managers to take specific steps prior to discharging poorly performing employees was relevant to whether Kelley's incompetence was the true reason for his dismissal. See Powers v. Grinnell Corp., 915 F.2d 34, 39 (1st Cir.1990); Berndt v. Kaiser Aluminum & Chem. Sales, Inc., 789 F.2d 253, 258 (3d Cir.1986). In addition, the district court admitted the Guidelines only conditionally, instructing the jury that, if the defense offered "testimony ... persuad[ing] you that [the Guidelines] would not be applicable to Mr. Kelley, [they] may not be considered in this case as part of the evidence." We see no abuse of discretion in the court's decision to admit the Guidelines.
 
 
 51
 Airborne raises a related claim that, once the district court had admitted the Guidelines, the court wrongly prevented Airborne from introducing rebuttal evidence that the Guidelines often were not followed and did not apply to Kelley. The district court did twice limit Airborne's questioning on the applicability of the Guidelines. When Airborne attempted to elicit testimony on cross-examination from Kelley about whether he had applied the Guidelines during his termination of an unrelated and lower-level employee, the court limited the inquiry stating that:
 
 
 52
 the only issue is whether [the Guidelines] were applicable to [Kelley]. So, if you want to talk about the applicability of the Guidelines to regional managers, that's one thing; but when you start talking about employees to whom there's no issue, I think it's time not properly spent.
 
 
 53
 At recess, Airborne made an offer of proof that Kelley would have testified that he "considered the circumstances to be emergency circumstances; and, therefore, the Guidelines were not followed."
 
 
 54
 Rule 611(a) of the Federal Rules of Evidence states:
 
 
 55
 The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time ... [.]
 
 
 56
 Although the proffered testimony was perhaps tangentially relevant to the issue, the district court was frustrated by the extremely slow pace of the trial and Airborne's circuitous presentation of evidence. The judge was within his discretion in limiting and focusing the scope of this inquiry in order to save time if there was no prejudice to appellant's case. See Elgabri v. Lekas, 964 F.2d 1255, 1259-60 (1st Cir.1992). After reviewing Airborne's offer of proof--that Kelley may have once fired a subordinate without following the Guidelines--we find that the exclusion of this testimony could not have prejudiced Airborne.
 
 
 57
 In addition, the district court excluded testimony from Goodwin. When Airborne attempted to question Goodwin regarding the Guidelines, the district court interrupted and asked Airborne's counsel whether he planned to introduce "anything remotely different ... than we've heard from two or three witnesses already?" Counsel responded that the Guidelines hadn't "yet been read." The district court then excluded the testimony as cumulative. On the present record, however, we cannot determine whether Airborne suffered prejudice from the district court's exclusion of the evidence because Airborne failed to make an offer of proof at trial describing the substance of the excluded testimony. See Earle v. Benoit, 850 F.2d 836, 847-48 (1st Cir.1988) (refusing to review a claim because appellant failed to make an offer of proof pursuant to Fed.R.Evid. 103(a)(2)). At no time did Airborne make an offer of proof that described the basic contours of the evidence Airborne planned to introduce through Goodwin in order to demonstrate that the Guidelines were not applied to managers similarly situated to Kelley. As a result, absent compliance with Rule 103(a)(2), we cannot assess the importance of the excluded evidence. See id. at 848. We thus find no error.
 
 
 58
 Third, Airborne objects to the admission of age-related comments made by Goodwin and Simpson. Kelley testified that in the summer of 1992, less than a year before his termination, Goodwin stated that age would be considered as a factor in selecting employees for termination in the RIF and Simpson said it would be a good time "to get rid of some of the older mediocre managers." Airborne argues that, because Goodwin did not make the termination decision, and the statements were temporally remote and not directed at Kelley, the judge abused his discretion by not excluding the evidence under Fed.R.Evid. 403. We disagree.
 
 
 59
 It is settled that statements made by decisionmakers can evidence age discrimination. See Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 676 (1st Cir.1996). In addition, statements by nondecisionmakers can be evidence that a discriminatory atmosphere pervades the workplace and infects the company's personnel decisions. See Conway v. Electro Switch Corp., 825 F.2d 593, 600 (1st Cir.1987). Simpson's remark had a direct bearing on age discrimination because Simpson made the decision to terminate Kelley. Similarly, Goodwin's remark was an alleged discriminatory statement by the head of human resources who participated closely in Kelley's termination and was in charge of the company's discrimination policy. Such a statement was at least admissible to show a discriminatory atmosphere. The statements were made less than a year before the termination while contemplating a reduction in force. As a result, we cannot say that the temporal relationship between the remarks and the termination was so attenuated as to render them irrelevant. See id. at 598. While certainly the statements "prejudiced" the defendant, all probative evidence is prejudicial, and the district court did not abuse its discretion in finding that the statements were not unfairly prejudicial.
 
 
 60
 After reviewing Airborne's remaining evidentiary contentions, we find them either unpreserved or without merit.
 
 B. Jury Instructions
 
 61
 Airborne contends that the district court committed reversible error by incorrectly instructing the jury as to the controlling principles of employment discrimination law. Airborne offers a host of objections: (1) the instructions incorrectly described the plaintiff's burden of proof; (2) the trial court erred by refusing to include instructions on business judgment, at-will employment, the "same actor" inference, and the meaning of the term "wrongful discharge"; (3) the trial court failed to comprehend the difference between an age discrimination case and a wrongful discharge case; and (4) an example that the trial court used to explain the concept of pretext was rambling and confusing. In Airborne's view, the cumulative effect of these errors was sufficiently prejudicial to warrant a new trial. We disagree.
 
 
 62
 We begin with a brief review of the controlling discrimination law. Because the plaintiff brought this action pursuant to the ADEA and ch. 151B, the case involved the delicate task of applying state and federal age discrimination laws that differ in some important, yet subtle, respects. Under both federal and Massachusetts law, plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); Blare v. Husky Injection Molding Sys., 419 Mass. 437, 646 N.E.2d 111, 116 (1995). The burden of production then shifts to the employer to articulate a non-discriminatory rationale for its employment action, which rebuts the employee's prima facie case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Under both Massachusetts and federal law, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him. See id. (quoting Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981)); Blare, 646 N.E.2d at 117.
 
 
 63
 Federal and state law differ, however, in the role that pretext plays in enabling a plaintiff to meet his burden of proving that the defendant intentionally discriminated against him. In Hicks, the Supreme Court explained the role of pretext in federal discrimination cases that proceed under the McDonnell Douglas burden-shifting framework:
 
 
 64
 The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination....
 
 
 65
 Hicks, 509 U.S. at 511, 113 S.Ct. at 2749 (emphasis added). Thus, under the ADEA, if the plaintiff establishes that the defendant's proffered reasons for the adverse employment action are not the true reasons, the trier of fact may, depending on the overall evidence, but is not required, to infer that intentional age-based discrimination was a determinative factor in the adverse employment action. See Woodman v. Haemonetics Corp., 51 F.3d 1087, 1091-92 (1st Cir.1995); see also Kline v. Tennessee Valley Auth., 128 F.3d 337, 343-44 (6th Cir.1997) (collecting cases).
 
 
 66
 In contrast, "Massachusetts is a 'pretext only' jurisdiction." Blare, 646 N.E.2d at 117; Carter v. Commissioner of Correction, 43 Mass.App.Ct. 212, 681 N.E.2d 1255, 1264 (1997).[2] Under the "pretext only" standard:
 
 
 67
 [A] plaintiff who has established a prima facie case and persuaded the trier of fact that the employer's articulated justification is not true but a pretext, is entitled to judgment.
 
 
 68
 Blare, 646 N.E.2d at 116 (emphasis added) (citing Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 355 N.E.2d 309, 315 (1976)); see also Lattimore v. Polaroid Corp., 99 F.3d 456, 465 (1st Cir.1996) (citing Blare ). The distinction matters: to prevail under Massachusetts law, a plaintiff carries "his burden of persuasion with circumstantial evidence that convinces the factfinder that the [employer's] proffered explanation is not credible." Id.; see Handrahan v. Red Roof Inns, Inc., 43 Mass.App.Ct. 13, 680 N.E.2d 568, 573-74, review denied, 425 Mass. 1107, 684 N.E.2d 1198 (1997); Powers v. H.B. Smith, 42 Mass.App.Ct. 657, 679 N.E.2d 252, 255 (1997); see also Kline, 128 F.3d at 343 (collecting cases and describing the "pretext only" standard).
 
 
 69
 We turn to Airborne's contention that the district court incorrectly instructed the jury on the plaintiff's burden of proof under state law. The district court described how both state and federal law require the plaintiff to prove the same prima facie case and explained that, under federal law, the plaintiff must prove that age had a determinative influence on his termination. In addition, the court explained that if the plaintiff proved that the defendant's stated reasons for terminating Kelley were pretextual, the jury should enter judgment in his favor on only the state claim. In relevant part, the district court verbally summarized Massachusetts law as follows:
 
 
 70
 [A] plaintiff who has established a prima facie case and persuaded the trier of fact that the employer's articulated justification is not true but a pretext, is entitled to judgment.
 
 
 71
 ...
 
 
 72
 Under the federal [law], it's the plaintiff's obligation to prove that age discrimination existed. Under the state law ... if the employer comes up with reasons which you find to be pretextual, these [sic] enough. There is no requirement under the state law for the plaintiff to prove that the reason for his being discharged was age. It is done in a different fashion. It's in combination ... with the prima facie case, that he was old, that he was fired, there was a younger man hired for the job ... [plus] the giving of a package of false reasons, for the discharge, leads the state court to conclude that the only reason for giving the false explanation, given the prima facie case, would be prohibited discrimination, that he was fired for age.
 
 
 73
 The jury instruction thus endeavored, in simplified terms, to distinguish between the "pretext only" standard used in Massachusetts and the federal standard, which allows, but does not necessarily require, a jury to find discrimination if the defendant's reasons were pretextual--perhaps a difficult concept for a lay jury to understand.
 
 
 74
 Airborne argues that the district court misstated the plaintiff's burden of proof when it stated that "[t]here is no requirement under the state law for the plaintiff ... to prove that the reason for his being discharged was his age." Airborne thus contends that the instruction on pretext implied that Airborne had the burden of persuasion on discrimination.
 
 
 75
 At first glance, the statement to which Airborne objects appears to support their claim because Massachusetts does, of course, require the plaintiff to prove age discrimination. The allegedly objectionable statement, however, was part of a longer discussion that involved not who had the burden to prove discrimination, but how the plaintiff could meet its burden of proving intentional discrimination under state law: by proving that the employer's stated reasons for the discharge were not the true reasons. The instruction, as a whole, correctly summarized Massachusetts law in this regard. Further, the district court stated that Kelley, not Airborne, had the burden of proof at all times.
 
 
 76
 Now, I keep talking about the plaintiff's burden. But I want it clear that the defendant has no burden.... It is not up to the defendant to prove that it was not his age that was the determinative influence, but it's up to the plaintiff to prove.
 
 
 77
 Reading the instructions as a whole, we see no risk that the jury failed to understand that, under ch. 151B, the plaintiff had the burden of proving that Airborne's stated reasons for terminating Kelley were not the true reasons.
 
 
 78
 Although Airborne suggests that Massachusetts is not a "pretext only" jurisdiction, that claim is directly contrary to Blare and its progeny. Under ch. 151B, Kelley had to prove that it was more likely than not that Airborne's stated reasons for discharging him were a pretext. See Lehman v. Prudential Ins. Co. of America, 74 F.3d 323, 327 (1st Cir.1996) (citing Blare, 646 N.E.2d at 118). Although perhaps inartful at times, the instruction adequately described state law. Airborne's counsel, despite repeated colloquies with the judge, simply refused to accept that Massachusetts is a "pretext only" jurisdiction.[3] The district court correctly refused Airborne's invitation to misread state law.
 
 
 79
 Airborne contends, second, that the court's refusal to provide a business judgment instruction at Airborne's timely request constitutes reversible error.[4] Airborne argues that a new trial is necessary because the cumulative effect of the court's inaccurate pretext instruction and the lack of a business judgment instruction left the jury with the "clear impression that it could substitute its judgment for Airborne's" and prevented the jury from "understanding Airborne's legal theory on the controlling issues of the case (the state of mind of the decisionmaker)."
 
 
 80
 "In reviewing a court's decision not to give a particular instruction, our duty is to determine whether the instructions as given tend to confuse or mislead the jury with regard to the applicable principles of law." Poulin v. Greer, 18 F.3d 979, 983 n. 3 (1st Cir.1994). While perhaps a business judgment instruction might have been useful in this case, its omission does not provide a basis for undermining the adequacy of the charge as a whole. We cannot see how the jury could have thought that it was free to find that age had a determinative influence on Kelley's discharge if it merely disagreed with Airborne's business judgment. The district court instructed the jury, on more than one occasion, that Kelley could prevail on his federal claim only if he proved by a preponderance of the evidence that the he would not have been fired but for his age.[5] Interrogatory number 2, which the jury answered affirmatively, asked "has the plaintiff proved that his age had a determinative influence on defendant's decision to discharge him?" These instructions did not permit or suggest that the jury could predicate a finding of age discrimination on their disagreement with Airborne's business judgment. Similarly, we cannot agree that the instruction prevented the jury from focusing on the state of mind of the decisionmaker. The district court said:
 
 
 81
 Here, the issue has to do with motive, state of mind.... [Y]ou're looking into the state of mind of the defendant company in discharging the plaintiff. It is a state of mind that existed or did not exist at the time of discharge.
 
 
 82
 These instructions adequately framed the only important question. Thus, we find no error in the decision of the district court not to give a business judgment instruction.[6]
 
 
 83
 Even if Airborne's argument prevailed under federal law, the damages awarded via ch. 151B would still stand. Airborne does not suggest that the failure to provide the business judgment instruction constitutes reversible error under Massachusetts law. Thus, the absence of the business judgment instruction has no effect on the defendant's liability under ch. 151B.
 
 
 84
 Airborne's third contention is that the district court's failure to include an "at-will" instruction and the "same actor inference" instruction provides a basis for vacating the jury's verdict.[7] Although a district court may be allowed to use these instructions in appropriate circumstances, see Achor v. Riverside Golf Club, 117 F.3d 339, 341 (7th Cir.1997) ("[W]e doubt [the at-will instruction] should have been given, and we are confident that they should not have used ... formal terminology."), Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir.1995)(holding that including the "same actor inference" in a jury instruction does not constitute reversible error), we are confident that the absence of these instructions could not have confused or misled the jury as to the controlling law.
 
 
 85
 Airborne claims a number of additional errors that warrant little discussion. The claim that Judge Garrity confused a wrongful discharge claim with Kelley's discrimination claim is without merit. The district court used the phrase "wrongful discharge" loosely at one or two points in the ten-day trial and twice in the jury instructions when discussing the calculations of damages, and there was some testimony that utilized the term. After reviewing the record as a whole, however, we discern no danger that the jury could have confused Kelley's ADEA and ch. 151B age discrimination claims with a contract-based wrongful discharge claim, see, e.g., Upton v. JWP Businessland, 425 Mass. 756, 682 N.E.2d 1357 (1997). Nor was the district court required to define wrongful discharge when there was no contract-based claim. To do so might have confused the jury.
 
 
 86
 Airborne's objection to the district court's resort to an analogy to demonstrate the difference between state and federal pretext analyses also fails. To illustrate the meaning of pretext, the court used the example of a couple, in which one spouse tells the other spouse that he or she is going to the store to get milk, when in fact, he or she is going to buy cigarettes as well and wants to conceal this fact. Airborne's only objection to the analogy at trial was that it "created the impression" that, under state law, the jury's finding of pretext was sufficient to find intentional discrimination. As the jury's finding of pretext was, in fact, sufficient to enter judgment on the state claim, we fail to see how the analogy constitutes reversible error. We need not consider Airborne's other arguments, that the analogy shifted the burden of proof and placed the jury in the position of being a "super-personnel agency," because Airborne failed to raise these concerns before the district court. See La Amiga del Pueblo, Inc. v. Robles, 937 F.2d 689, 692 (1st Cir.1991).
 
 
 87
 The instructions adequately explained the controlling discrimination law to the jury. We "customarily cede wide discretion to trial courts to fashion jury instructions as they see fit and we see no reason to second-guess the court in this instance." Evans v. Avery, 100 F.3d 1033, 1040 (1st Cir.1996) (citations omitted).
 
 
 88
 C. The District Court's Questioning of Witnesses
 
 
 89
 Airborne claims it suffered prejudice because the district court improperly commented on the evidence and interrogated the witnesses during the course of the trial. In particular, Airborne argues that the district court improperly trivialized Simpson's opinions regarding customer concerns and wrongfully criticized Guiod's business judgment. After reviewing the record, we conclude that Airborne failed to object properly to the district court's questions.
 
 
 90
 "Federal Rule of Evidence 614(c) provides that objections to the interrogation of witnesses by the court may be made at the time of the interrogation or at the next available opportunity when the jury is not present.... If a party fails to object to the court's interrogation of a witness at trial, his objection will not be reviewed on appeal."
 
 
 91
 Stillman v. Norfolk & Western Ry. Co., 811 F.2d 834, 839 (4th Cir.1987). In this case, Airborne's counsel did not object to the district judge's questioning of witnesses during the trial, either in front of the jury or when the jury was not present. The district court has the undisputed right to question witnesses at trial, see United States v. Henry, 136 F.3d 12 (1st Cir.1998), and proper objections are vital in order to assist the district court in ensuring that its participation is not unfairly prejudicial to one side. Thus, we will not review Airborne's claim that the district court's questions here constitute prejudicial error.
 
 IV.
 Damages
 
 92
 Finally, Airborne challenges the $1,000,000 front pay award under the ADEA and ch. 151B. Airborne advances four arguments: (1) that the district court abused its discretion in finding that reinstatement was impracticable or impossible; (2) the front pay jury instruction was inadequate; (3) the evidence was insufficient to sustain the jury's award; and (4) the district court improperly multiplied the jury front pay award pursuant to ch. 151B, § 9. We disagree and affirm the front pay award.
 
 A. Reinstatement
 
 93
 In his complaint, plaintiff's request for damages included a request for reinstatement or front pay.[8] On the first day of trial, the district court asked the defendant whether it could take a position on reinstating Kelley; the defendant declined. After the jury awarded $1,000,000 in front pay, Airborne filed a post-trial motion asking the district court to order Kelley reinstated. Airborne suggested that, because Kelley's RFSM position was filled, the district court could order that Kelley return to a specially created position of "at-large" RFSM, which it claimed offered compensation, benefits, and responsibilities similar to the position which Kelley had lost. Kelley would work for Simpson, his supervisor prior to his termination. Airborne reasoned that, because it was now "willing to reinstate Mr. Kelley as a result of the jury's finding that it acted wrongfully in terminating his employment, Mr. Kelley is not entitled to front pay."
 
 
 94
 The district court conducted two days of hearings on the legal and practical aspects of reinstatement, which included the receipt of additional testimony from Goodwin and a proffer from counsel describing the proposed position. The district court found that reinstatement was "impracticable in the extreme" and therefore awarded front pay under both the ADEA and ch. 151B, § 9.[9]
 
 
 95
 Airborne contends that the district court abused its discretion because (1) Kelley failed to show that his relationship with Simpson, his immediate superior, was hostile, (2) and that the trial court's findings were unsupported by the evidence. Under the ADEA, though the district court has equitable power to award front pay when plaintiff has "no reasonable prospect of obtaining comparable alternative employment," Powers, 915 F.2d at 42 (citation and quotation omitted), future damages should not be awarded unless reinstatement is impracticable or impossible. Wildman v. Lerner Stores Corp., 771 F.2d 605, 615 (1st Cir.1985). The district court has broad discretion to determine precisely how to compensate the injured plaintiff fully, see Selgas v. American Airlines, Inc., 104 F.3d 9, 13 (1st Cir.1997), and, given its ability to directly observe the litigants, it is in a far better position than an appeals court to judge the quality of their relationship, an important factor in determining the viability of reinstatement. See Wildman, 771 F.2d at 615. On appeal, an order denying reinstatement will be disturbed only when the reviewing court is left "with a definite and firm conviction that a mistake has been made." Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1201 (7th Cir.1989).
 
 
 96
 The district court based its decision on the considerable antipathy Airborne's top management held for Kelley, antipathy that the district court found went beyond the "animosity engendered by th[e] litigation." As the district court explained, Brazier disliked Kelley prior to the litigation; the other management staff had effectively vilified Kelley, which completely undermined his value as a manager; and Kelley's supervisor would be the man who had signed his termination letter--a termination the court described as "deliberately manufactured" without restraint. Further, the district court did not trust Airborne's reinstatement offer or their intentions. The court described the motion asking the court to reinstate Kelley as "just another strategic move" and found that the proposed "at-large" position was indefinite and "make-work."
 
 
 97
 The district court thus expressed deep concerns in its determination that Kelley's reinstatement to Airborne was impracticable. Given these stated reasons, we find the refusal to order reinstatement well within the court's discretion and amply supported by the record. See Maxfield v. Sinclair Intern., 766 F.2d 788, 795 (3d Cir.1985) (noting that reinstatement may be inappropriate if animosity has damaged the relationship between the parties); Cancellier v. Federated Dep't Stores, 672 F.2d 1312 (9th Cir.1982) (similar).
 
 B. The Front Pay Instruction
 
 98
 Airborne next contends that the district court incorrectly instructed the jury on how to calculate front pay damages. Within federal employment discrimination law, front pay is generally an equitable remedy awarded by the court, see Lussier v. Runyon, 50 F.3d 1103, 1108 (1st Cir.1995), while, under ch. 151B, the jury awards front pay, see Handrahan, 680 N.E.2d at 576. The district court thus submitted the issue of front pay to the jury. Airborne argues that, due to the district court's inadequate instructions on how the jury was to calculate front pay, the award should be vacated or, in the alternative, remanded for a further hearing.[10] We disagree.
 
 
 99
 "Our principal focus in reviewing jury instructions is to determine whether they tended to confuse or mislead the jury on the controlling issues." Service Merchandise Co., Inc. v. Boyd Corp., 722 F.2d 945, 950 (1st Cir.1983). We look to state law governing the award of front pay damages to determine if the jury charge was proper. See DaSilva v. American Brands, Inc., 845 F.2d 356, 362 (1st Cir.1988). In Massachusetts, front pay is considered a form of compensatory prospective damages, akin to future damages in the tort context. See Conway, 523 N.E.2d at 256-57. Massachusetts law requires that front pay awards not be speculative, that they be causally related to the wrongdoing, and that the plaintiff not be made more than whole. See id. at 257.
 
 
 100
 Airborne argues that the instruction was legally deficient because the district court failed to instruct the jury (1) to consider other relief that Kelley might recover and his prospects for obtaining comparable alternative employment and for continuing at Airborne in light of his health; (2) to consider whether his job would remain in existence given Airborne's economic future; and (3) to reduce front pay as much as necessary to keep Kelly from being overcompensated.[11] We disagree.
 
 
 101
 While some of Airborne's proposed instructions may have been useful, Massachusetts law does not suggest that the district court abused its discretion in not using Airborne's proffered instructions. What Massachusetts authority there is on front pay instructions indicates that the charge here was adequate. See Boothby v. Texon, 414 Mass. 468, 608 N.E.2d 1028, 1039 (1993) (approving front pay instruction in wrongful discharge case that jury could use its "common sense" in formulating a front pay award); Griffin v. General Motors Corp., 380 Mass. 362, 403 N.E.2d 402, 405 (1980)(approving instruction that the "plaintiff was 'entitled to her past and future impaired earning capacity' "). The district court adequately described the controlling legal principles; thus, we find no abuse of discretion.
 
 
 102
 C. The Sufficiency of Evidence on Front Pay Damages
 
 
 103
 Airborne challenges the jury's $1,000,000 front pay award under ch. 151B, arguing that the award is speculative and not supported by record evidence.[12] In its post-trial motions, Airborne moved pursuant to Fed.R.Civ.P. 59 for remittitur of the front pay award and for a new trial. The district court denied both motions. The trial judge has "discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence," Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433, 116 S.Ct. 2211, 2222, 135 L.Ed.2d 659 (1996) (citations and quotations omitted), or to order remittitur of the award in light of the evidence adduced at trial, see Conde v. Starlight I, Inc., 103 F.3d 210, 212 (1st Cir.1997). "[T]he role of the district court is to determine whether the jury's verdict is within the confines set by state law.... [We] then review the district court's determination under an abuse-of-discretion standard." Browning-Ferris Ind., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989).
 
 
 104
 We consider the damages evidence in the light most favorable to Kelley. See Vera-Lozano v. International Broadcasting, 50 F.3d 67, 71 (1st Cir.1995).
 
 
 105
 The proper front pay award was a hotly contested issue at trial and both sides introduced competent expert testimony on the issue. Plaintiff's expert estimated front pay damages to be $1,531,631 if Kelley worked at Airborne until age 60, $1,869,211 until age 62, and $2,377,482 until age 65. Airborne's expert calculated that Kelley would suffer $360,000 worth of front pay damage by age 55, but chose not to project beyond that age.
 
 
 106
 Airborne contends that we must vacate the jury verdict because Kelley presented no statistical evidence or other data that justified the expert testimony calculating Kelley's damages until age 60 and beyond. We disagree. "[A]n award of front pay, constituting as it does, an estimate of what a plaintiff might have earned had s/he been reinstated at the conclusion of trial, is necessarily speculative." Selgas, 104 F.3d at 14 n. 6. Massachusetts law is clear that uncertainty in the award of future damages does not bar their recovery, and we have said that the " '[g]enerousness of a jury's award does not alone justify an appellate court in setting it aside' [unless] it is shown to exceed any rational appraisal or estimate of the damages...." Linn, 874 F.2d at 6 (quoting Kolb v. Goldring, Inc., 694 F.2d 869, 871 (1st Cir.1982)).
 
 
 107
 There was sufficient evidence before the jury from which it could rationally have found $1,000,000 in front pay damage. Kelley intended to work at Airborne for the rest of his life; when Airborne fired Kelley, he was six years away from becoming fully vested in the company's pension plan; and Airborne's stated retirement age was sixty-five.[13] Both experts agreed that, without a college education, it would have been extremely difficult for Kelley to obtain a comparable salary. In addition, the jury awarded only about two-thirds of the front-pay damages the plaintiff's expert calculated Kelley would suffer had he worked until he was sixty-years old. On these facts, the district court did not abuse its discretion in declining remittitur.
 
 D. The Discretionary Multiplier
 
 108
 Airborne finally contends that the district court improperly imposed the discretionary multiplier contained in ch. 151B, § 9 on Kelley's front pay and emotional distress damages.[14] In the relevant part, the statute states:
 
 
 109
 Any person claiming to be aggrieved by a practice concerning age discrimination in employment ... may bring an action under this section for damages or injunctive relief or both.... If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but no less than two, times such amount if the court finds that the act or practice complained of was committed with knowledge, or reason to know, that such act or practice violated the provisions of said section four.
 
 
 110
 Mass. Gen. Laws ch. 151B, § 9 (emphasis added). After declining to order Kelley's reinstatement, the district court imposed a multiplier of 2.25 on the jury's award of back pay, front pay, and emotional distress damages in light of the jury's responses to the verdict form.
 
 
 111
 Airborne contends that settled principles of statutory construction and policy considerations indicate that emotional distress and front pay damages are not within the definition of actual damages subject to the discretionary multiplier. We disagree.
 
 
 112
 Airborne's first contention, that emotional distress damages are not actual damages, is incorrect. We note that in Fontaine v. Ebtec Corp., 415 Mass. 309, 613 N.E.2d 881, 883 & n. 4 (1993), the Supreme Judicial Court affirmed without comment the multiplication of an award of emotional distress damages pursuant to § 9. In addition, Massachusetts courts award emotional distress damages routinely in age discrimination cases pursuant to ch. 151B, § 9. See, e.g., Powers v. H.B. Smith Co., Inc., 42 Mass.App.Ct. 657, 679 N.E.2d 252, 257 (1997).
 
 
 113
 Airborne's second contention, that front pay is not a type of actual damages, is a question that has not been explicitly answered in Massachusetts. The plain meaning of the language used in ch. 151B makes clear, however, that front pay comes within the ambit of actual damages. In 1989, the Massachusetts legislature authorized the recovery of punitive damages in discrimination cases successfully brought under the chapter by adding the following provision to the third paragraph of § 9: "If the court finds for the petitioner, it may award the petitioner actual and punitive damages." Fontaine, 613 N.E.2d at 887 & n. 9 (emphasis added) (quoting St.1989, ch. 722, § 31). In 1990, the legislature amended the fourth paragraph of § 9 to provide for multiple damages specifically in cases of age discrimination by adding the following: "recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if" the act was committed with knowledge that it violated the statute. Id. (quoting St.1990, ch. 395) (emphasis added). The phrase "actual damages" must have a consistent meaning throughout ch. 151B, and the provision appears to distinguish between actual damages and punitive damages in discrimination cases. In Massachusetts, front pay is compensatory in nature, not punitive. See Handrahan, 680 N.E.2d at 576. It thus follows that front pay must fall within the definition of actual damages subject to the discretionary multiplier. Cf. DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 449 N.E.2d 1189, 1200 (1983) (defining "actual damages" in Mass. Gen. Laws ch. 93A, to include "all losses which were the foreseeable consequences" of the unlawful conduct).
 
 
 114
 Airborne's reading of ch. 151B, § 9 is implausible. The fourth paragraph of § 9 authorizes the award of damages in discrimination cases by stating that "recovery shall be in the amount of actual damages...." The provision contains no other authorization for the award of damages. Under Airborne's proffered definition, an age discrimination victim could never recover front pay because the loss of future pay would not be actual damage, and thus there would be no statutory basis on which to award it. The SJC, however, has explicitly held that § 9 authorizes the award of front pay. See Conway, 523 N.E.2d at 256-57. Therefore, front pay must be actual damages. The district court correctly found that the front pay award was subject to the discretionary multiplier.
 
 V.
 
 115
 For the reasons set forth above, the judgment of the district court is affirmed.[15] Costs to appellee.
 
 
 
 [1]
 Though we could recount more, a few examples will suffice. Brazier testified that the accolades heaped on Kelley in the "Top Gun" award letters were sincere. However, Goodwin, who actually drafted the letters for Brazier, tried to play down these accolades, stating that only Guiod deserved the award. Goodwin admitted on cross-examination that the "Top Gun" letters to Kelley were "phony as a three-dollar bill" and that, as the head of human resources, he would from time to time write things that were not true "to ... carry out the purposes of Airborne."
 Goodwin claimed that he helped draft Kelley's termination letter because Simpson did not have access to Simpson's secretary. Simpson contradicted this, saying the letter could have waited until he had access to his secretary.
 On cross examination, Simpson steadfastly denied sending the March 16, 1993, "reweigh reports" to Goodwin to create a factual record to justify Kelley's termination. First, he said he sent them for Goodwin's "information." Then he said he sent the reports because Goodwin had Kelley's personnel file, and Simpson did not want "to lose track of this document." Finally, on redirect, Simpson admitted that he sent them for Goodwin to use in the termination letter.
 On numerous occasions, the Airborne witnesses blamed Kelley for problems with the national Thomas Cook account. Contradicting this claim, a September 1992 E-mail written by Simpson listed five main geographic problem areas with the account, none of which were in Kelley's region.
 
 
 [2]
 We recognize that the viability of Blare has been questioned in light of Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128, 686 N.E.2d 1303 (1997). We express no view on the matter. Here the jury affirmatively responded on the jury verdict form that age had a determinative influence on Airborne's decision to terminate Kelley, and thus did not premise its liability on a finding of pretext alone. Even assuming that the instruction was erroneous because it enabled the jury to impose liability under the lower standard, the jury could not have been so confused as to obviate its explicit finding of discriminatory animus
 
 
 [3]
 At a post-trial hearing, the district court stated:
 [I]n so many ways the Court finds that defendants do not understand and indeed have probably never understood the essential elements and the scope of the law of the Commonwealth of Massachusetts. Repeatedly during the trial I sought to alert the defendants to the Court's understanding of the state statute, and my efforts appeared to fall on deaf ears.
 
 
 [4]
 As part of its requested pretext instruction, Airborne requested the following charge:
 Mr. Kelley must show more than that Airborne made an unwise business decision, an unnecessary personnel move, or acted arbitrarily.... Good faith errors in an employee's business judgment are not, standing alone, evidence of age discrimination.
 
 
 [5]
 The district court instructed the jury in the relevant part:
 The burden of proof at every stage in this case is on the plaintiff, meaning that a plaintiff must prove ... each essential element of plaintiff's claim by a preponderance of the evidence.
 ...
 Plaintiff's claim is that the defendant discriminated against him on the basis of his age when it terminated his employment. Under both the ADEA and the Massachusetts statute, it is unlawful for an employer to discharge any individual because of his age.
 ...
 Now, the question, again, is: Has the plaintiff proved this his age had a determinative influence on defendant's decision to discharge him? ... The test for liability, which if met by the plaintiff, requires a verdict in plaintiff's favor ... is enunciated in a leading decision of the Supreme Court of the United States as follows: A disparate treatment claim ... cannot succeed unless the employee's protected trait, in this instance his age, actually played a role in that process and had a determinative influence on the outcome.
 ...
 In ADEA discrimination--now this is federal, mind you, I'm talking about the federal claim and the federal statute--plaintiffs bear the ultimate burden of proving that their age was the determinative factor in their discharge; that is, that they would not have been fired but for their age.
 
 
 [6]
 Airborne's reliance on Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n. 6 (1st Cir.1979), is misplaced. In Loeb, we endeavored to make clear that district courts had the flexibility to tailor instructions to meet the specific requirements of each case. Id. at 1017-19. We merely noted that, in assessing a employer's articulated nondiscriminatory reason for the disputed employment action, the jury must focus on the employer's motivation, not on its business judgment. Id. at 1012 & n. 6. We did not suggest that a business judgment instruction is required in all age discrimination cases
 
 
 [7]
 Airborne requested that the judge instruct the jury as follows:
 Plaintiff is an at-will employee who can be discharged at any time as long as the discharge is not because of a discriminatory reason.
 ...
 When the individual who promotes a plaintiff is the same person who fires an employee, there is a strong inference that discrimination did not motivate the employment decision. You may, but are not required to, infer from this evidence that the decision to terminate Mr. Kelley's employment was not motivated by age."
 
 
 [8]
 The plaintiff explicitly refused to stipulate that it was not seeking reinstatement for fear of losing the right to front pay under the ADEA
 
 
 [9]
 The district court couched his finding in the "impracticable or impossible" standard because the parties proceeded under the ADEA. To terminate an employee's eligibility for front pay damages accruing after a reinstatement offer under Massachusetts law, an employer must make an objectively reasonable offer of reinstatement, and the employee must reject that offer. See Conway v. Electro Switch Corp., 402 Mass. 385, 523 N.E.2d 255, 258 (1988); Brady v. Nestor, 398 Mass. 184, 496 N.E.2d 148, 151 (1986)). Airborne does not seriously argue on appeal that its post-verdict motion seeking reinstatement terminated Kelley's right to the jury's award of front pay under ch. 151B. In fact, Airborne never made an offer to Kelley, in the sense of a legally binding offer that he could accept or reject. Rather, Airborne argued only that it was feasible for the court to order Kelley reinstated as an "at-large RFSM." Given the court's conclusion that reinstatement was impracticable, it follows logically that Airborne's never made an objectively reasonable offer. Kelley is thus entitled to the jury's front pay award under state law, notwithstanding Airborne's arguments respecting reinstatement under federal law
 
 
 [10]
 The district court instructed the jury on front pay as follows:
 If the plaintiff was wrongfully discharged, and he's making roughly half as much now as he did when he was on the job, and because of his age and circumstances can't get that same type of salary, he is entitled to lost future earnings for as long as you conclude he would suffer damage in that respect. And still stating, I don't mean to overlook the defendant's arguments, that he shouldn't be entitled to any damages at all because they didn't discharge him for his age, and, also, that there's no indication that he would have worked that long, that's the defendant's view....
 There is, and this is worth stating, an obligation in every case that a person seeking damages to, what they call, mitigate damages; that is, do his best to reduce the damages. And on that issue, there is no dispute in the evidence that plaintiff tried to get another job. He did get one ... and then he went to work for ... his father ... and he's making $40,000 a year. But I did note, and you perhaps noted it as well, that in these computations about future lost earnings, it was assumed ... that he was making $65,000, or was capable of making $65,000 instead of 40,000, the reason being he did get a job that lasted just a short time at the higher figure.
 The touchstone and the big principle with reference to damages is that they have got to be reasonable. Damages must be reasonable and not speculative. You are not permitted to award speculative damages.
 ...
 Damages must have been proximately caused by the wrongful discharge.
 ...
 One principle that may be relevant on the question of the duration of the proper period of time in which to award lost future wages is the principle entitled finding as to a thing once proved to exist. You may find that a state of affairs, once proved to exist, continues as long as is usual with things of that nature, in the absence of evidence in the case which leads you to a different conclusion.
 
 
 [11]
 Airborne claims that "the maxim that the 'thing once proved to exist' instruction creates a presumption requiring the production of contrary evidence by the party opposing the inference" and that it invites the award of speculative damages. Before the district court, Airborne's only stated basis for its objection to the instruction was that the court, rather than the jury, should determine the proper number of years for a front pay award. This claim had no basis in Massachusetts law, see Handrahan, 680 N.E.2d at 576, and thus Airborne failed to suggest a proper cure, see Linn, 874 F.2d at 5
 
 
 [12]
 Airborne also challenges the district court's award of front pay pursuant to the ADEA. Front pay is an equitable remedy intended "to bring the plaintiff to the position which s/he would have occupied but for the illegal acts." Selgas, 104 F.3d at 12. Given Kelley's $100,000 salary and that he would probably never gain comparable employment because of his lack of education, we find no abuse of discretion in the district court's decision to award $1,000,000 in front pay
 
 
 [13]
 As a disputed question of fact, Airborne was free to rebut plaintiff's evidence concerning his likelihood of remaining at Airborne with statistical evidence demonstrating that older workers, for whatever reason, were not likely to remain employed at Airborne. As Airborne notes in its brief, "such evidence would not have been unfairly difficult to obtain." The availability of statistical evidence that was not introduced by either party has no relevance to our limited inquiry: whether the evidence before the jury was sufficient to uphold the damage award
 
 
 [14]
 We note that Airborne does not argue that the district court abused its discretion in applying the multiplier based on the facts adduced at trial. We express no opinion regarding whether the application of the multiplier on these facts was appropriate. Our inquiry is limited only to a question of statutory interpretation: the meaning of the phrase "actual damages" in ch. 151B, § 9
 
 
 [15]
 Because the original opinion is this case was withdrawn, we followed the procedure outlined in Gallagher v. Wilton Enter., Inc., 962 F.2d 120, 124 n. 4 (1st Cir.1992), and circulated the proposed panel opinion to all of the active judges of the court for pre-publication comment, none of whom objected to it. Nonetheless, it should be noted that this procedure neither converts this opinion into an en banc opinion nor precludes a subsequent request for rehearing en banc on any issue