# United States Court of Appeals
## For the First Circuit

No. 00-2394

PAUL CUMMINGS,

Plaintiff, Appellee,

v.

THE STANDARD REGISTER COMPANY,

Defendant, Appellant.

No. 00-2395

PAUL CUMMINGS,

Plaintiff, Appellant,

v.

THE STANDARD REGISTER COMPANY,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Torruella, Selya and Lynch,

Circuit Judges.

Lisa J. Damon, with whom Julie C. McCarthy, Barbara Andrade and Seyfarth Shaw, were on brief, for appellant.

Mark D. Stern, with whom Mark D. Stern, P.C., Floyd H. Anderson, Campo Anderson, LLP and Joanne Fray, were on brief, for appellee.

---

September 14, 2001

---

**TORRUELLA, Circuit Judge.** Plaintiff-appellee-cross-appellant Paul Cummings brought this suit in Massachusetts Superior Court, alleging that defendant-appellant-cross-appellee Standard Register, Co. discriminated against him on the basis of age in violation of Mass. Gen. Laws ch. 151B, § 4. Standard Register removed the case to the federal district court for the district of Massachusetts and, after a ten-day trial, a jury found in favor of Cummings and awarded him $990,000 in combined front pay, back pay, and emotional distress damages. The district court doubled the front and back pay awards and denied Standard Register's motions for judgment as a matter of law, a new trial, or remittitur. On appeal, Standard Register challenges the court's admission of three witnesses' testimony and its refusal to remit the front pay award. Cummings cross-appeals, seeking pre-judgment interest on the jury's award as well as attorney's fees. We affirm in part and reverse in part.

## BACKGROUND

We highlight from the voluminous record the following facts relevant to these appeals.

Standard Register provides document management systems and services to companies within the health care, financial, and general business markets. On January 1, 1998, Standard Register acquired its competitor, UARCO, where Cummings, at the time forty-nine years old, had worked for seventeen years as a National Account Director (NAD) in

health care sales for the northeastern United States.  This area included all of New England, New York, New Jersey and the Philadelphia metropolitan area.

Standard Register had a similar position to Cummings' called a National Account Manager (NAM).  For the northeast region, Standard Register assigned two NAMs: Pamela Pedler, age thirty-one, covered New England and the New York metropolitan area, and Timothy Gabb, age forty-nine, covered the "Mideast" area, which extended westward from Pennsylvania into Ohio.  As a result of the merger, Standard Register had an overlapping sales force in the northeast, with Pedler, Gabb, and Cummings covering some of the same regions.  Standard Register directed Ted Stark, the head of Standard Register's National Healthcare Accounts, to integrate the sales force and eliminate overlapping sales areas.

To do this, Stark decided to divide the New England/New York metropolitan area into two different regions.  In filling the positions, Stark reassigned Gabb to the New York metropolitan area, and reduced Pedler's sales region to the New England area.  Stark then hired 30-year old Jed Cavadas, a former UARCO employee, to represent the firm in the Mideast area.  Cummings was not offered a position. Stark advised Cummings to contact two regional sales managers for other sales openings, but both managers told Cummings that they had none available.  Cummings' employment thus ended.

-5-

On December 30, 1998, Cummings brought an action in Massachusetts Superior Court, alleging that Standard Register had terminated his employment on account of his age.[1]  According to Cummings, Stark informed him that he was being terminated because he did not fit Standard Register's model of someone "young, handsome, aggressive, a little arrogant, and just like Jed Cavadas."  Cummings also alleged that the six different, non-discriminatory reasons offered by Standard Register at various times were pretexts for age animus. Standard Register removed the case to federal court based on diversity jurisdiction, 28 U.S.C. § 1332, on February 16, 1999.

During discovery, Cummings and Standard Register sought to reach informal and formal agreements concerning the production of documents and taking of depositions.  On March 3, 1999, Cummings made an informal request for the production of the personnel files of Pedler, Gaab, and Cavadas.  Cummings served a formal request for these same documents on April 2, 1999.  On April 26, Standard Register agreed to produce the documents on the condition that they be viewed only by Cummings' attorney and his staff.  Cummings filed an "emergency motion" to compel production of the documents without the stipulation on April 28, 1999, five days before Standard Register's response to the formal request was officially due.  Included in the motion was a request for

---

[1] Cummings filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) on April 28, 1998.  He closed his administrative case prior to filing his complaint in state court.

attorney's fees for expenses incurred in filing the emergency motion. The magistrate judge granted the emergency motion but denied the request for attorney's fees because the motion had been filed prior to the expiration of the thirty day time period in which Standard Register's response was due. Cummings filed a motion to reconsider which was denied by the district court on October 25, 1999.

Trial commenced on January 10, 2000. In presenting his case, Cummings offered the deposition testimony of two former Standard Register employees, John Weatherly and J. Michael Talley, who believed that they also were victims of age discrimination. Weatherly, who worked as a field engineer in Nashville, Tennessee stated that beginning in 1996, his boss, Gabe Perkins, indicated that he would be terminating Weatherly because he and other employees were "too old to do the job" and because "the older guys and guys like [him] just [didn't] have the stamina to . . . keep up with this." Weatherly also testified that Perkins' age-related comments to him and others "[were] like a broken record about these men." Talley worked as a sales representative in Seattle, Washington from 1984 to 1998. Talley testified that his supervisor, Rick Campbell, repeatedly told him that Standard Register needed to make room for "young blood." Talley also stated that after he was replaced by a younger employee, he filed an age discrimination complaint with the EEOC, which was removed to federal court and ultimately settled.

Cummings also introduced live testimony from his economic expert, Martin Duffy. Duffy testified to Cummings' future losses as a result of being terminated by Standard Register.[2] To calculate this, Duffy used Cummings' 1997 UARCO salary and bonus, which totaled $88,120, as a base salary. Using the average earnings increases cited by the Bureau of Labor Statistics (BLS) for salaried workers in the U.S. economy, Duffy increased Cummings' 1997 base salary by 3.9% per year to estimate his future salary. Estimating that Cummings would retire at age 63.83, adding in the value of future fringe benefits, and subtracting the income and benefits Cummings would earn if he continued at his (then) current employment, Duffy arrived at a total estimate for future front pay losses. On direct examination, Duffy testified that he estimated that, in 1999, Cummings would have earned $95,128 if he had stayed at Standard Register, and, in 2000, $109,824. He further testified that, based on his various assumptions, Cummings's future losses would total $656,867. This $656,000 figure was the expert's first front pay figure. However, he later withdrew it as being in error.

After being cross-examined, Duffy realized that either he or his software had made a mathematical error in applying the estimated 3.9% annual salary increases, resulting in inflated salary estimates

---

[2] Duffy also offered an estimate of Cummings' past losses, which are not challenged on appeal.

for 1999 and all subsequent years. After the court recessed for the evening, Duffy performed new calculations. Continuing on cross-examination on the following day, Duffy revised his estimate downward. To further complicate the matter, neither on cross-examination nor on re-direct did Duffy explicitly state the corrected front pay estimate. Instead, he gave a corrected figure for total losses (past and future), which was $162,155 less than his initial estimate for total losses. Because the mathematical error did not affect the past losses figure, the corrected estimate for future losses would be $494,712. And so, the expert's final front pay figure was the $494,000 figure.

Duffy also conceded on cross-examination that he had not used data specific to Standard Register, such as its average retirement age and its caps on compensation, nor considered the nature of the health care market in reaching his calculations. In addition, he stated that rather than using the mean of Cummings' earnings over the past five years as a base, he used Cummings' salary in 1997, a higher-than-average earnings year. Following Duffy's testimony, Standard Register made a motion to strike the expert evidence, which the district court denied.

Duffy's expert report was not introduced into evidence, nor was the posterboard he used during testimony to explain his calculations given to the jury. The jurors did not request a transcript of his testimony. They had only their own hand-written

notes and memories of his testimony to guide them in arriving at a damages award.

On January 24, 2000, the jury returned a verdict in favor of Cummings and awarded him $665,000 in front pay, $150,000 in back pay, and $175,000 in emotional distress damages.  The district court struck the emotional distress damage award because it was not included in Cummings' complaint and, pursuant to Mass. Gen. Laws ch. 151B, § 9, doubled the front and back pay awards for a total award of $1.63 million.  <u>Cummings</u> v. <u>Standard Register</u>, No. 99-10368-RWZ, at 8-10, 17-18 (D. Mass. June 1, 2000).  Standard Register filed a motion to strike, or in the alternative, to remit, the jury's front pay award on the grounds that it was speculative and excessive.  The court denied both motions.  <u>Id.</u> at 10-12.

On February 14, 2000, Cummings applied for an award of attorney's fees for all services rendered in the case, including those rendered by paralegals, law clerks, and associates.  The district court reduced the number of hours of compensation for four of the attorneys and the hourly rate for one attorney, and entered an award of attorney's fees in the amount of $287,331.50.  <u>Id.</u> at 12-17.  Adding fees and costs, the court entered final judgment in the amount of $1,934,516 on June 6, 2000.[3]  <u>Id.</u> at 17.  Cummings moved to alter or

---

[3] An amended judgment awarding Cummings an additional $875 in costs was entered on August 22, 2000.

amend the judgment to include interest on the front pay award from the date of the verdict to the date of entry of judgment. On August 4, 2000, the district court denied the motion.

## DISCUSSION

The issues raised on appeal are whether the district court erred in: (i) admitting the deposition testimony of Weatherly and Talley; (ii) admitting the testimony of Cummings' expert, Martin Duffy; (iii) refusing to remit the jury's front pay award; (iv) failing to grant attorney's fees on the motion to compel discovery; and (v) denying Cummings' motion for prejudgment interest on the front pay award from the date of the verdict to the entry of final judgment. We will address each issue in turn.

## A. Evidentiary Issues

Standard Register claims that other employees' allegations of age discrimination were irrelevant and unfairly prejudiced its case. Fed. R. Evid. 401, 403. It also argues that Duffy failed to meet the requirements for expert testimony under Fed. R. Evid. 702. We review a district court's decision to admit or exclude testimony for an abuse of discretion. Sheek v. Asia Badger, Inc., 235 F.3d 687, 693, 695 (1st Cir. 2000).

### 1. Weatherly and Talley Testimony

Rule 401 of the Federal Rules of Evidence states that evidence is relevant if it "has any tendency to make the existence of

any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." We have noted previously that this standard grants the district court substantial latitude in admitting testimony and for that reason, "[o]nly in exceptional cases will reversible error be found in the district court's determination of the probative value of testimony in a particular case." Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987). In admitting Weatherly's and Talley's testimony over the objections of Standard Register, the district court offered the following rationale:

> [I]t seems to me that, that the atmosphere, if you will, at the company is relevant for the purposes of drawing inferences one way or the other . . . . So I think that what happened at the company in general and what people heard is indeed relevant to the plaintiff's showing that there was an atmosphere that permits the inference he is asking the jury to draw.

We believe that the court did not abuse its discretion under Rule 401.

The sole issue at trial was whether age was a motivating factor in Standard Register's decision to terminate Cummings. We have recognized that since discrimination is often subtle and pervasive, plaintiffs must be able to rely on circumstantial evidence to prove discriminatory intent. See id. To this end, evidence of a discriminatory "atmosphere" may sometimes be relevant to showing the corporate state-of-mind at the time of the termination. See id. While

-12-

such evidence does not in itself prove a claim of discrimination, see Ruíz v. Posadas de San Juan Assocs., 124 F.3d 243, 249-50 (1st Cir. 1997), "[it] does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff."[4] Conway, 825 F.2d at 597 (citing Sweeney v. Bd. of Trs. of Keene State Coll., 604 F.2d 106, 113 (1st Cir. 1979)); see Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000).

Standard Register challenges the relevancy of the testimony on the ground that it covered different time periods, different supervisors, and different areas of the company. It is true that evidence of discrimination can be "too attenuated" to justify admission, Conway, 825 F.2d at 598, and that testimony to this effect should be let in sparingly. However, "evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific claim that generated a claim of discriminatory treatment." Id. at 597. Rather, the trial court must

---

[4] Contrary to Standard Register's assertions, anecdotal evidence is not limited to "pattern and practice" suits. In the disparate treatment context, such evidence is offered because "an employer's willingness to consider impermissible factors such as race, age, sex, national origin, or religion while engaging in one set of presumably neutral decisions . . . might tend to support an inference that such impermissible considerations may have entered into another area of ostensibly neutral employment decisions -- here, an employee's termination." Conway, 825 F.2d at 597-98.

consider the evidence in light of the entire case and determine whether it provides a basis for reasonable inferences related to the plaintiff's claim. See, e.g., Koster v. Trans World Airlines, Inc., 181 F.3d 24, 33 (1st Cir. 1999) (noting that admissibility of anecdotal evidence is often a "judgment call," and that while "[e]xclusion would not have been an abuse of discretion, . . . neither was admission"); cf. Goldman v. First Nat'l Bank, 985 F.2d 1113, 1119 (1st Cir. 1993) (anecdotal evidence did not give rise to reasonable inferences supporting plaintiff's claim of age discrimination). Here, Standard Register raised, as part of its defense, its national corporate practices of nondiscrimination, making evidence challenging those claims especially relevant. The district court, moreover, carefully weighed the probative value of other employees' testimony against its potential prejudicial effects, as evidenced by its exclusion of at least three other depositions in their entirety because they were "too remote in time" from the termination.[5] While the question is close and exclusion of the evidence would not have been error, we conclude that the district court did not abuse its discretion in admitting Weatherly's and Talley's deposition testimony. See Santiago-Ramos, 217 F.3d at 55 (stating that evidence of a company's general atmosphere is admissible along with other evidence bearing on motive).

---

[5] The court also sustained the majority of Standard Register's specific objections to particular parts of the Weatherly and Talley testimony.

Of course, decisions to admit or exclude such evidence always demand careful balancing, and it is noteworthy that any prejudicial effects of the testimony were further mitigated in light of the other evidence presented in this case. See Fed. R. Evid. 403; see also Kelley v. Airborne Freight Corp., 140 F.3d 335, 348 (1st Cir. 1998) (noting that "all probative evidence is prejudicial" and that the relevant question is whether the testimony was unfairly prejudicial). First, Stark's alleged statement to Cummings following the termination suggested that he was being terminated because he was too old. Cf. Schrand v. Fed. Pac. Elec. Co., 851 F.2d 152, 156 (6th Cir. 1988) ("With no other direct evidence of age discrimination in the case, the impact of the two former employees' testimony would be great."). The combination of Stark's statement and evidence of Standard Register's changing reasons for dismissal provided an independent basis for the jury to conclude that the company's stated rationales were pretextual and that the real motivation was age animus. The anecdotal testimony was therefore not so central to Cummings' case that it overwhelmingly influenced the jury's verdict. Consequently, we do not believe the probative value of the testimony was substantially outweighed by its potential for prejudice and uphold the district court's decision.

### 2.  Testimony of Martin Duffy

Under Rule 702, a witness may testify to scientific, technical, or other specialized knowledge if it "will assist the trier

-15-

of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; see Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993). In admitting such testimony, the trial court must perform a gatekeeping function and "decide whether the proposed testimony, including the methodology employed by the witness in arriving at the proffered opinion, rests on a reliable foundation and is relevant to the facts of the case." Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 259 (1st Cir. 1997) (internal citations omitted). Whether a witness meets these criteria is a case-specific inquiry, Irvine v. Murad Skin Research Labs., Inc., 194 F.3d 313, 320 (1st Cir. 1999), and a question "that the law grants the trial judge broad latitude to determine." Id. (citing Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999)).

Standard Register first challenges the methodology employed by Duffy in calculating Cummings' future losses. According to Standard Register, Duffy's failure to take into account company-specific data -- such as the average retirement age of its workers or its salary caps -- as well as his use of an unusually high earnings year as a base point contributed to an inflated and inaccurate forecast of front pay damages. It may be true that using specific variables would have resulted in a lower, and perhaps more accurate, figure. However, during cross-examination, Duffy offered sufficient explanations for why

he chose to use BLS data and Cummings' 1997 salary in his calculations.[6]
See, e.g., McMillan v. Mass. Soc'y for the Prevention of Cruelty to
Animals, 140 F.3d 288, 302 (1st Cir. 1998) (upholding an expert's
regression analysis where "her testimony show[ed] solid reasoning in
her determinations to exclude certain variables that the defendants
argued should have been included").  More importantly, Standard
Register has failed to show how the information Duffy did use was
incorrect, and does not dispute the district court's conclusion that
Duffy's assumptions are ones "that economists [make] with some
frequency."[7]  See SMS Sys. Maint. Servs. v. Digital Equip., 188 F.3d 11,
25 (1st Cir. 1999) (requiring that the cumulation of an expert's data
be "consistent with standards of [his] profession").  We agree with the
district court that whatever shortcomings existed in Duffy's
calculations went to the weight, not the admissibility, of the
testimony and uphold the district court's decision to allow it.  See

[6] In particular, Duffy stated that the BLS figures were in fact lower
than the average growth rate of Standard Register's salaries, that
Standard Register's salary caps did not include what a worker could
earn through a bonus, that using Cummings' 1997 salary (rather than a
mean) more accurately reflected his labor productivity, and that
company-specific retirement data (specifically its qualifying
retirement age on its 401(k) plan) might have been "helpful" but would
not necessarily affect when a person retires.

[7] Standard Register itself also failed to present evidence of the same
statistical data it claims was easily accessible to Duffy.  Cf. Kelley
v. Airborne Freight Corp., 140 F.3d 335, 356 n.13 (1st Cir. 1998)
(refusing to entertain "disputed questions of fact" concerning
company's statistics where that evidence was not offered into evidence
by either party).

McMillan, 140 F.3d at 302 (noting that the failure to include particular variables could diminish the testimony's probativeness, but would not render it "unacceptable").

Standard Register also highlights Duffy's computational error that was exposed on the second day he testified. The inflated estimation of Cummings' salary for the year 2000 could raise some red flags concerning the reliability of the predicted front pay damages. However, Duffy's mistake was not only revealed to the jury, but was duly corrected while he was still on the stand. The district court determined that as a result, Standard Register could argue, and Cummings would have to concede, that Duffy's report contained errors, allowing the jury room to discredit his testimony accordingly. We do not believe that this was an abuse of the court's discretion and affirm its decision to let the testimony stand. See Ed Peters Jewelry, 124 F.3d at 259 (citing United States v. Schneider, 111 F.3d 197, 201 (1st Cir. 1997) (emphasizing that "the district court has a comparative advantage over an appeals panel" in determining relevance and reliability)).

## B. Front Pay

Standard Register next challenges the amount of front pay awarded by the jury. First, Standard Register argues that the fourteen-year time period covered by the award is unduly speculative. Alternatively, Standard Register assigns as error the district court's

refusal to remit the jury's award based on the fact that it exceeded Duffy's estimates. We review the district court's determination to uphold the jury's award for an abuse of discretion, <u>Kelley</u>, 140 F.3d at 355, keeping in mind that a jury award is proper if it is based on any "rational appraisal or estimate of the damages" offered into evidence. <u>Beaupre</u> v. <u>Cliff Smith & Assoc.</u>, 738 N.E.2d 753, 767 n.26 (Mass. App. Ct. 2000) (citing <u>Kolb</u> v. <u>Goldring, Inc.</u>, 694 F.2d 869, 871 (1st Cir. 1982)).

## 1. Duration of the Front Pay Award

We begin by noting that "[a]n award of front pay, constituting as it does, an estimate of what a plaintiff might have earned had s/he been reinstated at the conclusion of trial, is necessarily speculative." <u>Kelley</u>, 140 F.3d at 355 (citing <u>Selgas</u> v. <u>Am. Airlines, Inc.</u>, 104 F.3d 9, 14 n.6 (1st Cir. 1997)). An award of front pay that extends over many years to an estimated retirement date should be examined carefully, however, since "the greater the period of time upon which a front pay award is calculated in a case involving an at-will employee the less likely it is that the loss of future earnings can be demonstrated with any degree of certainty or can reasonably attributed to the illegal conduct of the employer." <u>Conway</u> v. <u>Electro Switch Corp.</u>, 523 N.E.2d 255, 257 (Mass. 1988). Additionally, the award must take into account an employee's duty to mitigate damages by seeking other employment. <u>Id.</u> To sustain a front pay award over a

period of fourteen years in this case, therefore, the jury must have sufficient evidence to conclude that Cummings would be unable to find employment comparable to Standard Register's until his estimated retirement date, and that the date specified was a plausible one.

Examining the damages award in the light most favorable to Cummings, Kelley, 140 F.3d at 355, we believe that there was a sufficient basis for the jury so to conclude. First, as we have already stated, Duffy's BLS-based assumption that Cummings was a "long-term" employee who would retire at age 63.83 was admissible. The jury was free to credit fully this testimony and conclude that had he not been discriminated against, Cummings would have continued to work at Standard Register until this age. The jury also had evidence that following his termination, Cummings had several unsuccessful interviews with various competitors of Standard Register, including Moore Business Forms, Reynolds & Reynolds, Creative Business Forms, and Business Forms, Inc. Cummings also submitted his resume to internet employment services such as Headhunter and Monster.com, but received no response. Cummings then acquired one job at Ikon, which paid $45,000, but was laid off through no fault of his own. Finally, after a lengthy period of unemployment, Cummings secured a job at Kinko's which paid him $35,000 -- less than his job at Ikon and substantially less than his salary at Standard Register. As a federal court sitting in diversity jurisdiction, we must apply state substantive law to state-law causes

of action.  Under federal law, we have grave doubts as to the sustainability of a front pay award of so great a duration.  But the Massachusetts cases, as we read them, are more open-ended.  Here, even though Cummings did not present any specific evidence concerning the nature of the "forms and documents industry," we believe that the jury could have reasonably concluded, based on Cummings inability to find comparable employment despite substantial effort, that he was unable to mitigate further and was thus entitled to the lost pay differential until retirement.

### 2.  Award in Excess of Expert's Testimony

After correcting for his computational error, Duffy estimated Cummings' total front pay damages to be $494,712.  The district court concluded that since Duffy offered only a "conservative" estimate, the jury was allowed some margin to increase the award.[8]  Reasonable minds could certainly question whether Duffy provided the jury with enough evidence to arrive at a higher figure, even if the jury used less conservative assumptions (such as a later retirement age or a lower

---

[8] The district court highlighted five assumptions made by the economic expert, "any one of which the jury could have decided was too conservative and resulted in a damage award that was too low."  These included the assumptions that: (i) Cummings would receive the award in a regular stream rather than in a lump sum payment (which would result in additional tax consequences); (ii) Cummings would not enter any periods of unemployment; (iii) Cummings would retire at age 63.83 rather than work until age 65 or longer; (iv) the discount rate was 3% rather than a lower number that would result in greater damages; (v) Cummings compensation, with sales bonuses, would not be greater than Duffy's projections.

discount rate). Under Massachusetts law, determinations as to the amount of front pay damages are within the "common sense" of the jury and do not require expert testimony. See, e.g., Griffin v. General Motors Corp., 380 Mass. 362, 366 (1980); Boothby v. Texon, Inc., 414 Mass. 468, 486 (1993). Here, though, there was expert testimony and it was for a $494,000 figure, and not $665,000. On the record, it is far from clear that the jury even attempted to arrive at its own determination of future damages. Rather, the record suggests that the jury was simply confused by the expert's initial computational error. Duffy's initial, erroneous estimate for front pay damages was slightly more than $656,000. The jury awarded $665,000. The similarity here is striking. Moreover, there is no clear way to reconstruct how the jury would have arrived at an award of $665,000. We think it likely that this was a case of jury confusion, rather than a case of a jury intentionally adjusting an expert's figures upwards. This determination, coupled with the very real question as to whether the evidence suffices to support a $665,000 award, leads us to conclude that Cummings must choose between a new trial on the issue of front pay damages, or agree to remit the jury's front pay award to $494,712. See Conde v. Starlight I, Inc., 103 F.3d 210, 216 (1st Cir. 1997) (ordering remittitur or new trial on damages where trial court neglected to discount for present value in calculating remittitur); Shingleton v. Amor Velvet Corp., 621 F.2d 180, 182 (5th Cir. 1980) (entering

-22-

remittitur where jury miscalculated damages and mere "mechanical correction" was required, quoting _Stapleton_ v. _Kawasaki Heavy Industries, Ltd._, 608 F.2d 571, 574 n.7 (5th Cir. 1979)).

## C. Attorney's Fees

In his cross-appeal, Cummings first challenges the magistrate judge's denial, and the district court's refusal to reconsider, his request for attorney's fees based on his motion to compel discovery.[9] We review a district court's handling of pretrial matters, including discovery, for an abuse of discretion. Thibeault v. Square D Co., 960 F.2d 239, 242 (1st Cir. 1992). Here, we find none.

Under Rule 37(a)(4)(A),

> If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party . . . whose conduct necessitated the motion . . . to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(4)(A). Cummings filed a formal request for other employees' personnel files on April 2, 1999. Pursuant to Fed. R. Civ. P. 34(b), "[t]he party upon whom the request is served shall serve a

---

[9] Cummings' additional argument that the district court awarded "no fees for any services performed by either paralegal workers or law clerks," is utterly baseless. The district court awarded a total of $287,331.50 in attorney's fees, $264,750 of which was for work performed by attorneys. The remaining $22,581.50 was for the work performed by law clerks and paralegals, exactly the amount Cummings now claims was denied by the court.

written response within 30 days after the service of the request."
Cummings could have requested the court to shorten the response period.
Fed. R. Civ. P. 34(b). Since he did not, Standard Register's response
to its formal request was due on May 3, 1999. Cummings filed his
motion to compel discovery on April 28, 1999, five days before Standard
Register's response was due. In denying Cummings' request for
attorney's fees, the magistrate judge determined that imposing
sanctions on Standard Register for failing to produce documents before
its time period for filing a response (to the original request) had
expired would be "unjust." This reasoning falls squarely within the
ambit of the rules and was clearly not an abuse of discretion. We
therefore uphold the magistrate judge's denial of attorney's fees in
this regard as well as the district court's denial of both Cummings'
motion to reconsider and request for additional attorney's fees spent
appealing the magistrate judge's ruling.

## D. Prejudgment Interest

Cummings also challenges the district court's denial of
prejudgment interest on the front pay award from the date of the jury's
verdict, January 24, 2000, to the entry of judgment on June 4, 2000.
Both parties concede that postjudgment interest on state law claims is
governed by federal law. See, e.g., Fratus v. Republic W. Ins. Co.,
147 F.3d 25, 30 n.5 (1st Cir. 1998). The Supreme Court has made clear
that federal postjudgment interest "properly runs from the date on

-25-

entry of judgment." Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990). Whether Cummings is entitled to interest on the front pay award for the time period between the jury verdict and the entry of judgment, therefore, is a matter of state law. See Fratus, 147 F.3d at 30.

Cummings bases his argument on Massachusetts law, which states that "[w]hen judgment is renderd [sic] upon the verdict of a jury . . . interest shall be computed upon the amount of the . . . verdict . . . from the time when made to the time the judgment is entered." Mass. Gen. Laws ch. 235, § 8. However, this statute, which is followed by language indicating that "[e]very judgment for the payment of money shall bear interest from the day of its entry," id., has been interpreted by the Supreme Judicial Court of Massachusetts as providing interest at the prejudgment rate following entry of judgment. See, e.g., City Coal Co. of Springfield v. Noonan, 677 N.E.2d 1141, 1142-43 (Mass. 1997) (noting that "every judgment bears postjudgment interest" pursuant to chapter 235, section 8). Before that time, interest on the jury's verdict is governed by sections 6B and 6C of chapter 231. See Mass. Gen. Laws. ch. 231, §§ 6B & 6C (providing for prejudgment interest in tort and contract cases). Neither of these provisions allows prejudgment interest on front pay awards. See Conway, 523 N.E.2d at 258-59 (finding "no justification for adding interest to damages which, by definition, are for losses to be incurred

in the future).  The district court thus correctly denied Cummings'

motion for additional prejudgment interest on the front pay portion of

the jury's verdict.

**CONCLUSION**

The decision of the lower court is **affirmed** in part, **reversed** in part, and the case **remanded** for further proceedings consistent with this opinion.