Eason v. Town of Salem             CV-00-525-M    02/12/02
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Rhonda Eason,
      Plaintiff

      v.                               Civil No. 00-525-M
                                       Opinion No. 2002 DNH 043
Town of Salem,
      Defendant


                         **O R D E R**


      Rhonda Eason brings this action against her former employer,

the Town of Salem, seeking damages under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, et seq.  She claims that

the Town wrongfully discharged her from her position as a Special

Police Officer based on her gender.  The Town denies any

wrongdoing and moves for summary judgment.  Eason objects.


                      **Standard of Review**

      When ruling on a party's motion for summary judgment, the

court must "view the entire record in the light most hospitable

to the party opposing summary judgment, indulging all reasonable

inferences in that party's favor."  Griggs-Ryan v. Smith, 904

F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate

when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Background

In October of 1997, the Salem Police Department hired Eason as a "Clerk II," an administrative position that involved the processing and maintenance of pawn slips and police department records. Eason's immediate supervisor with regard to police records was Sharon Savage. Her supervisor with regard to pawn slips was Captain Alan Gould, who, in turn, reported to Police Chief Stephen MacKinnon. A little less than one year later, in August of 1998, the Town hired Eason as a Special Police Officer. She worked as both a Clerk II and Special Police Officer for the Town until August 29, 1999, when she resigned from her position as a Clerk II. She remained on the Town's roster of Special

2

Police Officers until February 18, 2000, when her employment was terminated.

Although Eason acknowledges that her Title VII claim relates exclusively to her discharge as a Special Police Officer, her memorandum in opposition to summary judgment chronicles several events that transpired during the course of her work as a Clerk II. She recounts those events "for evidentiary purposes," because she "believes that the discriminatory treatment she experienced as a Clerk II is relevant to her present claims." Plaintiff's objection (document no. 10) at 2 n.1. Reduced to their essence, those claims suggest that Eason felt that her co-workers (mostly women) treated her unfairly (e.g., stopped speaking to her, accused her of drug use and promiscuity) and her male supervisors either did nothing to stop that behavior or, in some cases, actively encouraged it.

From the Town's perspective, Eason appears to have been something less than the model employee. See, e.g., Exhibit 8 to plaintiff's memorandum (document no. 10), memorandum from Captain Gould to Chief MacKinnon ("Since Ms. Eason was hired [as a Clerk

3

II] in October of 1997, I have spent more time trying to resolve issues for her than any other employee I can remember.  Most of these issues were personality conflicts that occurred between Ms. Eason and other members of the clerical staff. . . .  Although I helped Ms. Eason with these conflicts for more than a year, I realized several months ago that Ms. Eason needs to accept responsibility for most of the issues which have been created.").

The first incident that gave rise to disciplinary action against Eason arose in July of 1999, in the context of her job as a Clerk II, when she confronted and allegedly used profanity toward her supervisor, Sharon Savage.  Ms. Savage filed a written complaint with Captain Gould, who then referred the matter to the Chief.  An administrative hearing was held, at which Eason appeared along with a union representative.  Eason acknowledged that her behavior was inappropriate and she was issued a written warning.  See Exhibit C-5 to defendant's memorandum (document no. 6).

The day after Eason received notice of the written warning, she filed a written complaint of harassment, in which she set

4

forth five instances of alleged harassment to which she was subjected (again, all of those instances related to Eason's employment as a Clerk II).  See Exhibit 5 to plaintiff's memorandum; Exhibit C-7 to defendant's memorandum.  Chief MacKinnon conducted an investigation into Eason's allegations, which included taking statements from all pertinent parties and soliciting additional information from Eason (some of which she declined to provide).  See generally Exhibit B to defendant's memorandum, Affidavit of Stephen B. MacKinnon at para. 11.  See also Exhibit C-7 to defendant's memorandum (documents relating to Chief MacKinnon's investigation).  In the end, the Chief issued a written report, discussing each of Eason's complaints, the results of his investigation into each alleged incident of workplace harassment, and his conclusion that each claim raised by Eason was unfounded or that Eason had refused to provide sufficient information to permit a meaningful investigation.  See Exhibit C-8 to defendant's memorandum.

On July 25, 1999 (i.e., approximately a year after she was hired as a Special Police Officer), Eason was assigned to traffic detail and instructed to direct traffic near the grand opening of

5

a Target store.  During the course of that detail, a driver apparently misunderstood Eason's hand signal and incorrectly proceeded through the intersection.  Eason allegedly screamed at the driver and ordered him to pull over.  He complied.  Eason then radioed for backup and two Salem police officers responded to the scene (a third officer arrived subsequently, but it appears that she never exited her cruiser).  The situation was soon resolved and the driver was permitted to leave the scene with an oral warning to more carefully heed the hand signals given by police officers.

The following day, Chief MacKinnon received an anonymous phone call from a person he assumed to be the driver involved in the previous day's incident (the "Target incident").  That person complained to the Chief about the treatment he had received at the hands of Eason.  The Chief conducted an informal investigation that included, among other things, speaking with the police officers who responded to Eason's call for backup.  Their recollection of the events in question supported the claims made by the anonymous caller.  The Chief then advised Eason's immediate supervisor of the incident and recommended that Eason

6

be counseled on various issues relating to professionalism and proper treatment of members of the public. See Exhibit 9 to plaintiff's memorandum. As a result of that incident and the prior incident that resulted in the written reprimand, the Chief concluded that Eason would benefit from stress and/or anger management training.

On August 12, 1999, Chief MacKinnon met with Eason to discuss the Target incident. During the course of that meeting, the Chief decided that Eason was giving evasive, if not inaccurate, responses to his questions. In particular, the Chief appeared concerned that Eason was claiming that she had been struck by the vehicle, notwithstanding the fact that police logs and Eason's own communications with other police officers that day showed that she said she was "almost hit" by the vehicle. See, e.g., Exhibit 9 to plaintiff's memorandum (revealing, among other things, that one of the officers who responded to Eason's request for backup reported that Eason told him that the driver almost struck her with his automobile). The Chief was also troubled by Eason's failure to follow various police protocols, as well as other conduct on her part that he viewed as

7

unprofessional.  <u>See generally</u> Exhibit B to defendant's

memorandum, Affidavit of Stephen B. MacKinnon.


Following that meeting, Chief MacKinnon decided to

temporarily remove Eason from the roster of Special Police

Officers.  He drafted a memorandum outlining the basis for his

decision, concluding that:


>    Based on these observations, I am not confident in your
>    abilities to carry out the duties of a Special Police
>    Officer.  Therefore, I will be removing you from the
>    work schedule with the exception of attending Special
>    Officer Training sessions and general meetings of the
>    entire roster.  During this time you are not to
>    identify yourself as a Special Police Officer or take
>    any other actions as a police officer.
>
>    During this time I will attempt to locate appropriate
>    training for you to address these performance concerns.
>    Once that is achieved I will consider allowing you to
>    return to the work schedule.

Exhibit 10 to plaintiff's memorandum.


Chief MacKinnon says that notwithstanding his reasonable

efforts, he was unable to locate appropriate training sessions

for Eason through either the New Hampshire Police Standards and

Training Council or private organizations.  <u>See</u> MacKinnon


8

Affidavit at para. 15. During the same time frame, the Salem Police Department began a review of the hours and tasks performed by its Special Police Officers, with an eye toward reducing the department's staffing. See MacKinnon Affidavit at para. 16. See also Memorandum of Chief MacKinnon to Mary Donovan, dated February 9, 2000, attached to plaintiff's affidavit (document no. 12). In that memorandum, the Chief solicited Ms. Donovan's thoughts with regard to the following observations and proposals:

> I have made a review of all the Special Officer's activity in 1999. We have a number of Special Officers who have worked little or no hours and have not been available to work when called. There are seven employees that fit this definition. Since we still maintain liability insurance on them and have to keep them trained to maintain their certifications (i.e., firearms qualifications) it would be my intent to advise the Police Academy that they are no longer Specials within Salem and tell Payroll to take them off the computer. It is not cost effective to keep them on the roster.

> * * *

> In addition, there are an additional 7 Special Officers that have questionable commitment. I plan to send a letter to each of them asking [them] to respond in writing within a certain time frame if they are still interested in working with us. No answer, no job. The letter would also include an expectation of more activity seen by them within the next 6 months or they will be taken off the roster as well.

9

Id. It is unclear from the record whether Chief MacKinnon ever sent the letters he referenced in that memorandum. Eason denies ever receiving such a letter.

Shortly thereafter, Eason and ten other Special Police Officers (all men) were removed from the department's roster, as part of a reduction in force. Eason was notified of her permanent removal from the Special Officer roster by letter dated February 18, 2000. Exhibit B-16 to defendant's memorandum. Chief MacKinnon says Eason was terminated "due to the force reduction, her past poor performance and anger/stress-management issues, and her dishonesty in the course of the inquiry into the Target incident." MacKinnon Affidavit at para. 17. He denies that Eason's gender played any role in that decision. Id. Eason, on the other hand, says her termination was wrongfully motivated by a gender-based animus and, therefore, violated Title VII.

**Discussion**

I.  <u>Title VII and Gender-Based Discrimination</u>.

    A.    <u>The Analytical Framework</u>.

Title VII of the Civil Rights Act of 1964 (as amended) makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In cases such as this, where there is little overt evidence of gender-based discrimination, courts typically employ the burden-shifting framework articulated by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See also</u> <u>Carey v. Mt. Desert Island Hosp.</u>, 156 F.3d 31, 34 (1st Cir. 1998).

The Court of Appeals for the First Circuit has summarized the <u>McDonnell Douglas</u> burden-shifting paradigm as follows:

> Under this formulation, a plaintiff opens with a prima facie showing of certain standardized elements suggestive of possible discrimination.

* * *

11

Establishment of the prescribed prima facie case
creates a presumption that the employer engaged in
impermissible [gender] discrimination.  However, to
rebut this presumption, the employer need only
articulate a legitimate nondiscriminatory reason for
the employee's termination.  The employer's obligation
is simply one of production.  The burden of persuasion
remains the employee's at all times.

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir.

1993) (citations and internal quotation marks omitted).  More

recently, the court described the elements of a prima facie case

of gender-based discrimination - the first step in the burden

shifting paradigm - as follows:

[The plaintiff] must show that (1) she is a member of a
protected class; (2) she was performing her job at a
level that rules out the possibility that she was fired
for inadequate job performance; (3) she suffered an
adverse job action by her employer; and (4) her
employer sought a replacement for her with roughly
equivalent qualifications.

Smith v. Stratus Computer, Inc., 40 F.3d 11, 15 (1st Cir. 1994).

If the plaintiff establishes a prima facie case of

discrimination, the burden shifts to the employer to articulate a

legitimate, non-discriminatory justification for the adverse

employment action taken against the plaintiff.  If the defendant

succeeds in carrying that burden of production, the burden

12

reverts to the employee, who must then demonstrate that the reason articulated by the employer was a mere pretext for unlawful gender discrimination.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).  See also LeBlanc, 6 F.3d at 842.  To carry that burden, the employee must produce "not only minimally sufficient evidence of pretext, but evidence that overall reasonably supports a finding of discriminatory animus." Id., at 843 (citation and internal quotations omitted).  He or she "may not simply refute or question the employer's reasons. To defeat summary judgment at this stage, a plaintiff must produce evidence that the real reason for the employer's actions was discrimination."  Gadson v. Concord Hosp., 966 F.2d 32, 34 (1st Cir. 1992).

B.    Eason's Claims and Evidence.

Assuming that Eason has established a prima facie case of unlawful gender-based discrimination,[1] the burden falls upon the

---

[1]    It is doubtful that Eason has established that she was performing her job "at a level that rules out the possibility that she was fired for inadequate job performance" or that she has shown that "her employer sought a replacement for her with roughly equivalent qualifications."  Stratus Computer, 40 F.3d at 15.  Nevertheless, the court has assumed the minimal evidence proffered by Eason is sufficient to meet her initial burden.

13

Town to articulate a legitimate, non-discriminatory justification for the adverse employment action it took against her.  As noted above, "[a]t this second stage, the framework imposes on the defendant only a burden of production.  The burden of persuasion remains at all times with the plaintiff."  Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999), cert. denied, 528 U.S. 1161 (2000).  The Town has met that burden by credibly asserting that Eason was terminated as part of a reduction in force, and because of her history of unprofessional conduct, her stress and/or anger-management issues, and her dishonesty when questioned about the so-called Target incident.  If taken as true, such evidence supports the Town's assertion "there was a nondiscriminatory reason for the adverse action" taken against her.  St. Mary's Honor Center v. Hicks, 509 U.S. at 509.

So, the burden of persuasion reverts to Eason, who must introduce sufficient evidence to permit a reasonable trier of fact to conclude that the Town's stated motivations are simply a pretext for unlawful gender-based discrimination.  At this stage, Eason must:

14

> demonstrate that the proffered reason was not the true reason for the employment decision.  This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.  She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981) (citing McDonnell Douglas, 411 U.S. at 804-05)).  See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination.").  Importantly, however, Eason may not simply deny or question the Town's reason for terminating her.  "To defeat summary judgment at this stage, a plaintiff must produce evidence that the real reason for the employer's actions was discrimination."  Gadson, 966 F.2d at 34.  See also Stratus Computer, 40 F.3d at 16.  She has failed to carry that burden.

In an effort to demonstrate that the Town's proffered justification for her termination is merely a pretext for unlawful gender-based discrimination, Eason points to the events

15

that gave rise to the general animosity she felt from her co-workers as a Clerk II, as well as the following "incidents" that occurred in the context of her work as a Special Police Officer:

> 1. The plaintiff was treated with "kid gloves" by her male Field Training Officer and was kept "out of harm's way" during an incident in which they had to draw their weapons.
>
> 2. During the "Target Incident," referred to by the defendant, the plaintiff's version of the event was not believed by other male officers who responded to the scene and her suggestions about how to handle the situation were not followed.
>
> 3. After the "Target Incident" the plaintiff's version of the event (which included her statement that the motorist's vehicle made contact with her person during the incident) were not believed by Chief of Police Stephen MacKinnon and she was removed from the Special Police Roster and required to undergo stress and anger-management training.
>
> 4. Chief MacKinnon never located stress and anger-management training for the plaintiff to attend.
>
> 5. Although the plaintiff was authorized to attend Special Police Officer training sessions as well as general meetings of the Special Police Officers, she never received notice of sessions and meetings as was the customary practice.

Plaintiff's memorandum at 3-4 (citations omitted).

16

Even crediting those allegations as true and giving Eason the benefit of all reasonable inferences that might be drawn from them, they are insufficient to permit a reasonable fact-finder to conclude that the Town's proffered justification for terminating Eason's employment is merely a pretext for unlawful gender-based discrimination.

With regard to her complaint that her Field Training Officer treated her with "kid gloves" and tried to keep her "out of harm's way," Eason testified that she had never observed that officer interact with a male partner. Consequently, she could not say whether his conduct was gender based or merely his customary behavior toward a fellow officer, designed to protect his partner from harm and offer appropriate support (particularly when that fellow officer is still undergoing training). See Eason deposition at 150-51. As to Eason's complaints concerning the investigation in the wake of the Target incident, Chief MacKinnon spoke to the responding officers (one of whom flatly contradicted Eason's claim that she was struck by the vehicle), reviewed all of the incident reports generated after that incident, reviewed Eason's own taped transmissions with the

17

dispatch officer, and examined Eason's conduct immediately following the incident (including, for example, the fact that, contrary to established protocols governing officers injured on the job, Eason never submitted any written report concerning a work-related injury stemming from her claim to have been struck by the vehicle). See Exhibits 8 and 9 to plaintiff's memorandum. After conducting that investigation, he concluded that, contrary to Eason's subsequent representations, she had not been struck by the vehicle. Based upon the evidence before him, one cannot say that Chief MacKinnon's conclusion was unreasonable. Even more importantly, however, there is nothing in the record to suggest that his conclusion (even if wrong) was the product of any gender-based discriminatory animus toward Eason.

As to Eason's claims concerning Chief MacKinnon's failure to locate an anger and/or stress-management course for her, nothing in the record even remotely suggests that the Chief's proffered explanation is either false or that he purposefully avoided finding such programs due to some unlawful bias against Eason. With regard to Eason's claim that she never received the "customary" notice of meetings of Special Police Officers, she

18

has failed to provide any evidence that such meetings were ever conducted during the relevant time frame.  Consequently, it is entirely possible that she received no notice of such meetings because none ever occurred.

Finally, while the incidents suggestive of an allegedly hostile work environment relating to Eason's tenure as a Clerk II might be relevant to her wrongful discharge claim, see, e.g., Cummings v. Standard Register Co., 265 F.3d 56, 63-4 (1st Cir. 2001), they are insufficient, even when viewed in light of all other evidence produced by Eason, to permit a rational trier of fact to conclude that Eason was discharged from her position as a Special Police Officer on account of her gender.  That evidence suggests, at most, that there were some personality conflicts among the women with whom Eason worked (at least some of which might have been caused by Eason herself); it does not support the inference that Eason was subjected to any sort of gender-based bias in the workplace.

In sum, Eason's evidence of unlawful gender-based discrimination within the Salem Police Department is, at best,

19

sparse and of minimal persuasive value. It is certainly insufficient to rebut the Town's proffered, non-discriminatory basis for terminating her employment. Nor does it provide any basis from which to conclude that the Town's true (undisclosed) motivation was unlawful, gender-based discrimination.

## Conclusion

Even making the doubtful assumption that Eason has met the minimal requirements necessary to make out a prima facie claim of unlawful gender-based discrimination, the Town has responded with a credible, non-discriminatory justification for her termination that is well supported in the record. In response, Eason has failed to point to evidence sufficient to demonstrate that the Town's proffered explanation for her termination is pretextual and, in fact, designed to disguise its true, unlawful, discriminatory conduct. Consequently, the Town is entitled to judgment as a matter of law. Its motion for summary judgment (document no. 6) is, therefore, granted. The Clerk of the Court shall enter judgment in accordance with this order and close the case.

20

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

February 12, 2002

cc:   Thomas J. Gleason, Esq.
      Diane M. Quinlan, Esq.